(56 South. 897.)

No. 18,765.

GRANT v. NEW ORLEANS RY. & LIGHT CO.

(Dec. 11, 1911.)

(Syllabus by the Court.)

1. CARRIERS (§ 303*) — INJURY TO PASSENGERS.

When a street car has been stopped in order to allow passengers to alight, and the conductor, being inside, starts the car without knowing the condition of affairs on the platform, he is guilty of negligence, and the company operating the car becomes liable in damages to a passenger who is injured by reason of the starting of the car while he is in the act of alighting; nor does it affect the question that the conductor may have called out, "Is it all right back there?" and have heard an answer in the affirmative.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1228½; Dec. Dig. § 303.*]

2. EVIDENCE (§ 571*)—EXPERT TESTIMONY—PERSONAL INJURIES—EVIDENCE OF PHYSICIANS.

Where a woman, suing for damages for personal injuries resulting from an accident, has the benefit of the testimony of medical men, selected by her, as to her actual condition just after the accident, and at the time of the trial, and the defendant is denied such benefit, by reason of her objecting to an examination by physicians selected by him, or appointed as experts by the court, the testimony of the plaintiff's witnesses stands much upon the same footing as would that of an expert accountant, named by one litigant, in a case in which the other litigant has been denied all access to the account constituting the subject of the litigation.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2395–2398; Dec. Dig. § 571.*]

3. DAMAGES (§ 185*)—PERSONAL INJURIES—EVIDENCE OF CAUSE.

Where the evidence in a suit for damages for personal injuries leaves a margin of possibility and probability that a particular physical condition may be the result of causes, other than that set out in the petition, no damages predicated upon such condition can be recovered.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 503–508; Dec. Dig. § 185.*]

Appeal from Civil District Court, Parish of Orleans; E. K. Skinner, Judge.

Action by Nellie Grant, wife of T. Hurley, against the New Orleans Railway & Light Company. Judgment for plaintiff, and defendant appeals. Modified and affirmed.

Hall, Monroe & Lemann, for appellant. A. A. Calongne, for appellee.

MONROE, J. This is an action in damages for personal injuries alleged to have been sustained by plaintiff as the result of the negligent starting of one of defendant's street cars, from which, as a passenger, she was alighting.

The testimony of plaintiff and her witnesses, taken as a whole, as to the more important facts, may be summarized as follows:

She was 31 years old and weighed 187 pounds at the time of the accident. She boarded the car in question on the morning of December 23, 1908, incumbered with a valise (sometimes called "satchel," and at other times, called "grip"), a basket, containing cake and a bottle of syrup, a bundle of sugar cane, and a boy about six years of age. When the car stopped, in response to her signal, at the corner of Rampart and Gravier streets, she went on the platform, with her basket in her right hand, the sugar cane in her left hand, or under her left arm, the boy following closely behind, and leaving the valise on the platform. When she had put her right foot down upon the step intervening between the platform and the ground, the conductor, who was about midway of the car, upon the inside, gave

the signal to start, and the car started. Her balance being thereby disturbed, she shifted the basket from her hand to her arm, and grasped the rear grab handle of the car with the thus disengaged right hand; but she was nevertheless thrown from the car, and swung around and behind the rear end of it, and, maintaining her grasp of the handle, was thereby dragged about a half a square, or, say, 150 feet. The car then stopped, and she was caught by Dave Thomas, a stranger to her, who happened to be on the spot, and whilst held by him, she said to the conductor:

"If I had been a white lady, you would have given me time to get off the car; you didn't give me time to put my foot on the step when you rang the bell."

To which the conductor replied:

"Go on, nigger; you had time enough."

A negro man—a passenger on the car—then brought her valise and placed it beside her; and Thomas assisted her to the banquette, where he seated her. After remaining on the banquette for a little while, she walked several squares to the house of Mrs. Couilliette, where her aunt had rooms, and, not finding her aunt there, she walked several other squares to the house of Mrs. Price, where she spent the night. The next morning she and her aunt went to see her lawyer, on St. Charles street, and later in the day went to see a physician in Carrollton, who examined her womb, and finding that she was threatened with a miscarriage prescribed for her, and advised her to go home. and lie down. She then went back to Mrs. Price's, and went to bed, and four days later had a miscarriage, being attended by Sallie Miller, a midwife who happened to be in the house, and who remained with her for nine days. At the end of about two weeks, she again called upon the physician, who found her womb and her general condition much worse than when she had first called. He treated her for several months, at the end

of which period she consulted another physician; and the two consulted together, and thought that the womb ought to be "curetted"; but neither of them appears to have urged that the operation be performed. At the time of the trial—nearly two years after the accident—plaintiff, according to the testimony of her physician, was suffering in various ways, and was in a generally broken down condition, but, through her counsel, she successfully objected to an examination by experts to be appointed by the court. There are contradictions, discrepancies, and coincidences in the testimony, of which the foregoing is a summary, to which we shall make some reference hereafter.

The only witnesses called by defendant who testified as to the immediate facts of the accident were the motorman and conductor of the car by which the accident is said to have been caused. They practically concur to the effect that, when the car stopped, the conductor was inside, collecting fares, and gave the signal to start, after calling out, "Is it all right back there?" or words to that effect, and receiving an answer in the affirmative. They say that as the car started some one said that a lady had left her "grip," and that the car was stopped within 35 feet; that plaintiff, or some woman, was then advancing to get the grip, or was standing, unsupported, in the street, when a negro passenger got off the car and carried the grip to her; and that, so far as they knew, the matter ended there, and they made no report of it until some time afterwards, when plaintiff asserted her claims.

Reverting to discrepancies, contradictions, etc., in the testimony adduced on behalf of plaintiff, we find it difficult to believe that a woman weighing 187 pounds, holding by one hand to the grab handle of a car, and having a basket of cake and syrup suspended on her arm, could by such tenure be dragged a half square; and more difficult still to understand how it happens, if she were so

dragged, that she received no injury to her feet or lower limbs, or even to her clothing or shoes. It is true that one of her witnesses—Alphonse Phillips—testifies that, with nothing to support her, save her hold, with one hand, upon the grab handle, she was carried the half square with her feet swinging in the air, but that is even more incredible, and, besides, he is contradicted by plaintiff herself and her other witnesses; all of them saying that she was dragged along the ground or pavement. In her direct examination, plaintiff testifies that she was confined to her bed for four weeks after the accident. In her cross-examination, she says that she visited the doctor on December 24th, 25th and 26th, and that she had the miscarriage on the 27th. The doctor says that she made her second call on him two weeks after the first. Mrs. Price says that she remained in bed 23 days after the miscarriage. Plaintiff's aunt testifies that she called on plaintiff on the morning after the accident, and said to her:

"I don't see what I can do. Try and put on your clothes, and I will take you to your lawyer."

That they called on the lawyer, and from there went to the doctor, and that she then took plaintiff back to Mrs. Price's, and put her in bed, where she stayed for 14 or 15 days.

Julia Brown testifies that she has known plaintiff since she was a baby, and was her school and music teacher, and her testimony proceeds as follows:

"I was walking up from Canal street, on my way from downtown, and a car (No. 49 of the Dryades street line) came to a dead [stand] still, and a passenger had one foot on the platform and one on the step. * * * The passenger was Nellie Grant, and she had a little boy with her. The conductor was about midway in the car. The car gave a jerk, she lost her balance, and she grabbed hold of the handle of the car, * * * the last handle of the vestibule of the car. She had a basket on her arm, and the car dragged her about midway of the block; the car, going full speed, knocked the little boy off,

and he rolled over in the gutter. Q. How far from Gravier street were you? A. Not very far from the corner; I can't tell you the distance. Q. About how far; about half a block? A. No, sir; about a quarter of a block; near the corner. * * * Q. When was your attention first attracted to the car? A. My attention was first attracted to the woman when she was dragging. Q. That is the first time you saw her? A. Yes, sir. Q. You can't be mistaken about that? A. No, sir; I can't be mistaken. Q. That was the first time you saw her? A. Yes, sir. Q. And when you saw the woman dragging, where were her feet? * * * A. Her feet were dragging on the ground. Q. Both of them? A. Yes, sir. * * * Q. Which arm was the basket on? A. Her right arm. * * * Q. Where was the sugar cane? A. On the platform. Q. Then you saw the sugar cane on the platform, and the woman hanging on behind? A. Yes, sir. Q. That is the first time you saw the car? A. When I first saw the car, she had one foot on the platform and one on the step. Q. You testified a moment ago that the first time you saw the car was when the woman was dragging. Now you say that the first time you saw the car she had one foot on the platform and one on the step. Which is the correct statement; did you see the car before the woman began to drag? A. I saw when the car came to a dead standstill and stopped still; she was on the platform, one foot on the platform, and the other on the step, and the little boy was by her side. * * * She was holding her right hand on the grab handle, and the little boy was on her left. * * * Q. When you first saw the woman, you saw the sugar cane on the car? A. Yes, sir. Q. Now, what part of the car was the sugar cane on; was the sugar cane inside of the car? A. No; it was on the platform. * * * Q. Where was the woman when the car first stopped? A. She was on the platform, attempting to get off. Q. She alleges in her petition that she was in her seat, and rose to get up—. A. I don't know; I was on the street. Q. Is it not a fact that what attracted your attention to the car was seeing the woman hanging on the back? A. Yes; that is my statement; it attracted my attention when she was grabbing the handle, and the little boy was by her side. By the Court: Tell what you saw; don't try to illustrate. A. I saw the woman when the car went off in full speed, and she lost her balance, and the car, going on full speed, threw the child from the car. Q. And the car was going at full speed the moment that it started? A. Yes, sir."

The witness then testifies that the young man (Dave Thomas, who was a stranger to her, as well as to the plaintiff) picked up the boy, and placed him on the sidewalk, and

then caught plaintiff by the arm, and that she (witness) assisted him in getting plaintiff to the sidewalk, where he sat plaintiff down; and her testimony proceeds:

"Q. How long did you stay there? A. Not very long; he told me that he would attend to her. Q. What was she doing when you left? A. She was sitting down, and seemed to be in great misery. Q. Had they brought any sugar cane to her? A. I went on, I told you. * * * A. I heard her say if she was a white woman he [the conductor] would have taken more pains and he said something back to her—'Go on, nigger.' Q. When was that? A. That was when the man was taking her from the car. Q. And where was the conductor then? A. He was standing in the door."

The "man" (Dave Thomas) to whom the witness refers testifies in part as follows:

"A. I saw the lady when she got off the car—this lady with the little boy. As she went to step off the car, she had one foot on the platform and one on the step, and the conductor was in the middle of the car, and before she had time to get off the car he started the car off, and he dragged her about 50 feet, near the middle of the block, and I ran and caught her, and took her on the sidewalk, and the car stopped. * * * Q. Was there anybody there with you when that happened? A. Yes; there was another lady that came to her rescue after she was sitting down. * * * Q. And you say the conductor was where? A. In the middle of the car is where I saw the conductor, before it stopped. * * * Q. After you seated her on the curb, did you go on about your business? A. Yes; I went on about my business afterwards. * * * Q. Were you standing on the sidewalk? A. Yes, sir. * * * I was going back Gravier, and waited until the car passed me, and that is where I saw this lady when she missed her balance and the car dragged her, and I ran behind the car when it dragged her. * * * Q. Where was the basket when you got hold of Nellie Grant? A. On her arm. * * * A. Yes [the car stopped], about 50 feet from the corner, and I took her off. * * * Q. After you set her down on the sidewalk, you went about your business? A. Yes; that lady came to her rescue. Q. Where was Nellie Grant when you left the scene of the accident? A. She was sitting down on the sidewalk. * * * Q. Now you say that woman was dragged 50 feet? A. Yes, sir. Q. Was she lying on the ground when she was being dragged? A. She was dragged with one arm, and her foot was on the ground, and when the car came to a dead standstill I was the only one that grabbed her. Q. She held on with one hand to

the grab handle of the car? A. Yes, sir. Q. And as the car started on, instead of letting go the grab handle, she ran after the car? A. She ran after it? Q. Yes; wasn't she on her feet all the time? A. No, sir; just one of her feet was on the step; she could not run behind the car; she was dragged. Q. Then all the time the car was going 50 feet she had one foot on the step? A. Yes; just one foot on the step, and the other foot was dragging on the ground; on the pavement. Q. Therefore she had one foot on the step, she had the grab handle in her hand, and the other foot was dragging on the ground? A. Yes, sir. Q. And when the car stopped the second time you helped her off the step and put her on the sidewalk? A. Yes, sir."

Alphonse Phillips says that he was in the car, rear seat, left side, and further in part as follows:

"Q. Before the car started, where was the woman? A. She had one foot on the platform and one foot on the step, and the conductor gave the signal to start, and he was in the middle of the car. * * * A. After the car was dragging her, I hollered to the conductor that the woman was not off the car, and afterwards he stopped, and she fell to the ground, and he started off again, and I noticed she had a grip and a basket and a bunch of sugar cane. Q. What did you do? A. I got off the car, and went back to her with the grip. Q. What did you do after that? A. After I brought her the grip, there were people around there, and I went off. * * * Q. She had the basket in one hand and the bunch of cane in the other hand [referring to plaintiff's position before the car started]? A. Yes, sir. Q. Where was the grip at that time? A. Sitting on the platform. * * * Q. If she had the basket in one hand and the bunch of sugar cane in the other, how could she get hold of the grab handle? A. She let the cane drop that way on the outside. * * * A. She had it mostly under her arm. * * * Q. From the time she fell off the step until the car stopped, you say that she went 150 feet? A. Yes, sir. Q. Did she travel that 150 feet with the grab handle in her left hand and her body dragging on the ground, or was she running after the car? [Memo. The witness had previously said that plaintiff was getting off with her face to the car, or backwards, and had seized the grab handle with her left hand.] A. She was mostly swinging to the car. Q. Was any part of her body on the ground when she was being dragged those 150 feet, as you said? A. No; she was not on the ground. Q. Then she was on her feet? A. She was swinging behind the car, and had hold of the back grab handle. Q. And her feet were on the ground? A. I can't say if her feet were on the ground. Q. Where were

her feet? A. She was swinging. Q. You don't mean to say that she was holding herself in the air by one arm, do you? A. She was holding the grab handle; she grabbed with both hands when she was jerked. Q. Where were her feet when she was being dragged 150 feet? A. Her feet were swinging out. Q. Did they touch the ground, or were they in the air? A. It seemed to me they must have been in the air a little way. Q. You don't think they were on the ground? A. No, sir; I don't think. Q. And you don't think that her feet were on the ground, and that she was running behind the car? A. No, sir; she was swinging. Q. In other words, she held herself in the air with the grab handle, and ran 150 feet, until you hollered to the conductor? A. Yes, sir. * * * Q. And then you say that at that time [when the witness placed the grip beside her] she was standing upon the sidewalk? A. No; she was not on the sidewalk; they had picked her up in the street, and she was standing there. Q. And she was standing in the street, and not on the sidewalk? A. Yes; the people picked her up."

Sallie Miller says that she was standing on the corner of Gravier and Rampart streets when car 49 came along, and further, as follows:

"A. As I was standing there, the car came to a standstill, a stop, and she came on the platform. Q. Nellie Grant? A. Yes, sir; to get off, and just as she came to the platform she put one foot on the step, to step down, and the bell rang and * * * the car started off; and when the car started off she lost her balance, and she fell, and she had a basket on her arm, and she grabbed the side of the car with the handle, and when she fell that turned her face to me, and the car was going on, and that dragged her a half block; and she had a little child with her, and the child was thrown head over heels off the car onto the ground on the side. It looked like the man rang the bell before the woman got off the car; and then I saw a man run and pick up the little boy, and set him on the side of the banquette, and he ran and caught her and straightened her up. * * * Q. She ran after the car until it stopped? A. No; she was dragging; she could not run; the car was going on. Q. Did any part of her body touch the street? A. The grab handle held her up. Q. In other words, she went the 150 feet, or half a block, holding with one hand to the grab handle and her feet dragging along the stones? A. Yes, sir."

Lulu Rousseau gives the following, with other, testimony:

"A. Yes; I saw the car stopped, and there was some one about to get out. I was going uptown, and the car was coming down, and I looked to see who got out of the car, as I always do, and I saw a passenger about to get out, with her face towards the river. Q. Who was that passenger? A. It was Nellie Grant; and I saw her, with a basket on her arm and her hand holding the rear end of the car, and as she went to step off the car started ed off in a hurry, and it jerked her, and she dragged about half a block."

[1] It will be observed that Julia Brown first testifies that, from a distance of a quarter of a square below the point where the car stopped, she saw that plaintiff, who was getting off at the farther end of the car, put her right foot down on the step; that she had a basket on her right arm, and a boy at her left side; that the conductor was in the middle of the car; and that the bundle of sugar cane was on the platform. And it will also be observed that the other witnesses, standing or moving about on the street, give pretty much the same details, in almost the identical language used by Julia Brown, though the putting down of one foot or the other, by a passenger getting off a street car, whether with or without a basket, or with or without a boy, and the position of the conductor, are not matters of such interest as ordinarily to so impress themselves upon the minds of indifferent persons that they are able, two years later, to retail them as though they were reading from a book. But Julia Brown could not have seen the boy or the sugar cane, as she says she did, and it is doubtful whether she could have seen the conductor or the basket; for, when a woman weighing 187 pounds, with a basket in her right hand, is descending from the platform of a street car, there is no room at her left side for a boy. Nor can a person who is a quarter of a square away, in front, and upon the exit side of a car, see a bundle of sugar cane on the rear platform; nor yet do we think it likely that a person so situated could very well see a basket on the off side of an alighting passenger, or very well fix the position of the conductor in

a car, on a day in December, though, no doubt, the two last-mentioned things may be possible. Julia Brown could not, however, have seen the sugar cane on the platform, because the witnesses who were in a better position to know say that it was not there. It was either under plaintiff's left arm, or else it had fallen to the ground. Again, Julia Brown, who has known plaintiff since she was a baby, and was her school and music teacher, says that she left plaintiff seated on the banquette, apparently in great misery, because the "young man," whom she did not know and whom plaintiff did not know, said that he would attend to her. But the "young man" testifies that he also left plaintiff in the same place and condition, because the lady, who had come to the rescue, had taken charge, or said that she would do so. It is true the young man, when called in rebuttal, did not hesitate to contradict himself, and to say that he stayed with plaintiff until she left the banquette, and accompanied her to the house where she expected to find her aunt. And no more did Julia Brown, after testifying in detail to the exact situation when the car stopped, hesitate to testify that her attention was first attracted to the car by seeing the woman dragging behind it, or, when she found that her two statements could not be reconciled, hesitate to repudiate the second and fall back on the first. Upon the whole, we seriously doubt whether Julia Brown was present at the scene of the accident; and if Sallie Miller was there it was something of a coincidence that she should, by mere chance, have been at Mrs. Price's house, a few days later, just in time to be employed as the midwife to attend the plaintiff, who was an entire stranger to her, in her miscarriage. Leaving out other points in the testimony which might be made the subject of criticism, and finding it, as we have stated, impossible to believe that plaintiff dragged over the pavement or swung through the air for a distance of 150 feet, our con-

clusion is that the witness Thomas comes nearer to describing the true situation than the others, and that what really happened was that when plaintiff had put one foot down on the step the car started off with a jerk, which disturbed her balance, and that, in the act of falling, she seized the grab handle, and, although her body swung around, she managed, for the few seconds during which the car was traveling, say 35 or 50 feet, to maintain that hold, and also to maintain her one foot on the step, which thereby in part supported the weight of her body; the probability being that the other foot, from time to time, touched the ground. The starting of the car, under the circumstances, was due to the negligence of the conductor, which is not excused by his calling, "Is it all right back there?" and his supposed or actual reception of an affirmative answer, and defendant is liable to the extent of the damage thereby inflicted on plaintiff. We are, however, of opinion that the amount awarded is excessive. It appears from the record that, in 1903, plaintiff was divorced for adultery, and that she was then living a practically lewd life; and it also appears that she had not been married again when the accident occurred, though she was at that time some two months and a half advanced in pregnancy. It further appears that on March 24, 1909, she submitted herself to the treatment of the second physician whom she consulted, and he testifies that she was then in bad condition, particularly with regard to her womb, and that her condition became worse, so that when the testimony was given, say, in November, 1910, she could hold no intercourse with her husband. The further fact appears that she married her present husband on March 27, 1909, and, if we understand the testimony correctly, she was no more fit to hold intercourse with him then than afterwards, and we think that it may justly be inferred that the bad state that she was in at the time of the trial was

largely attributable to her marriage. The miscarriage, it is true, had occurred several months before the marriage, and we do not wish to be understood as holding that plaintiff's immorality would be any bar to the recovery of damages for that occurrence, if we were satisfied that it was attributable to the accident upon which this suit is founded. But we are not so satisfied. The plaintiff had the advantage, on the trial, of the testimony of three physicians of her own selection, whom she allowed to examine her, not only when she was first injured, but at the time of the trial, but she never would permit any physician representing the defendant to examine her at all; and when, during the trial, defendant's counsel moved the court to appoint experts for that purpose plaintiff's counsel objected, and the objection was sustained.

[2] Whether the ruling so made was correct or not (and we find it unnecessary to decide the question), the result is that, whereas plaintiff has been allowed the benefit of the testimony of medical men selected by her as to her actual condition just after the accident and at the time of the trial, defendant has been denied the opportunity and the right to rebut that testimony, which, therefore, stands upon much the same footing as would that of an expert accountant, named by one litigant, in a case in which the other litigant has been denied all access to the account constituting the subject of the litigation.

[3] The defendant did call to the stand two physicians, as experts, and they were examined by means of abstract and hypothetical questions, and it appears to us, not only from their testimony, but also from the testimony of plaintiff's witnesses, that there is a margin of possibility and probability that plaintiff's condition, when she was first examined after the accident, and the subsequent miscarriage, may, in a person leading the life to which she appears to have been accustomed, have been attributable to causes other than the accident. The consensus of the testimony is that plaintiff's womb should have been "curetted," and that the operation is simple and effective, and the preponderance of the testimony goes to the effect that the sooner an operation of that kind, if there be occasion for it, is performed, the better. There seems, however, to be some difference of opinion between plaintiff's advisers on the question whether her condition warranted the operation, and it has not been performed, or even urged. We are, however, of opinion that plaintiff was subjected to a severe nervous shock and unusual strain, and that she suffered considerably in consequence, and we think she should be compensated.

It is therefore ordered, adjudged, and decreed that the amount allowed by the judgment appealed from be reduced to $1,000, and that, as thus amended, said judgment be affirmed; plaintiff to pay the costs of the appeal.