### CRUTSINGER et al. v. B. F. AVERY & SONS, Inc., et al.*
### No. 4517.

Court of Appeal of Louisiana. Second Circuit.

March 31, 1933.

*Rehearing denied April 28, 1933.

Foster, Hall, Barret & Smith, of Shreveport, for appellants.

J. Rush Wimberly, of Arcadia, for appellees.

MILLS, Judge.

Plaintiff, a widow 35 years old, accompanied by her two children, Charley, aged 6, and Quay, aged 4, and a woman companion, on the afternoon of May 11, 1931, was driving from Shreveport toward Minden on highway No. 80, in a Ford sedan.

Following her was a truck and trailer belonging to defendant company, driven by its salesman S. D. Helm in the usual course of his employment. In an effort to pass the car being driven by Mrs. Crutsinger, Helm speeded up, cut out to the left, and was driving alongside of the Ford when he saw a car coming toward him in such close proximity that he abandoned his intention of passing and cut sharply to the right to get back to a place of safety on the right-hand side of the road. In doing this, through a miscalculation of time and distance, he struck the left rear end of plaintiff's car, throwing it around so that it headed toward the left and ran squarely into the path of the on-coming car. The inevitable collision knocked the Ford into the ditch, completely demolishing it, and causing injuries to plaintiff and her two children, for which damages are claimed in this action.

The only testimony in contradiction of the above statement of fact is that of Helm, who ascribes the accident to the action of Mrs. Crutsinger in slowing down without warning, causing the cars to touch, and in looking around when they met instead of watching ahead. The preponderance of the testimony overwhelmingly refutes this defense and makes reasonably certain plaintiff's right to recovery.

Mrs. Crutsinger's injuries are divisible into two classes, physical and mental, or neurotic.

Her physical injuries, according to the testimony of Dr. A. A. Herold, a witness for plaintiff, who treated her when she was brought to the North Louisiana Sanitarium from the scene of the accident, and during her twelve-day stay at that institution, were: Painful lacerations of the forehead, face, chin, lower lip, and eye. These healed in due course, leaving no permanent disfigurement. Brush burns and general contusions about the body. The right shoulder was most severely injured, though no bones were brok-

en. The X-ray taken at the time of injury showed no physical impairment of the shoulder, but one taken in April, 1932, showed that since the accident a prolific osteitis and ostearthritis had developed at this joint. The excess bone production in and around the joint had caused a slight widening of the joint. On examination made the day of the trial, October 13, 1932, Dr. Herold found a small enlargement above the shoulder joint with crepitation or roughness evident when the joint is moved. He says that this slightly interferes with the use of the shoulder, but will probably stiffen and cause more serious trouble in the future. Three of her ribs were broken. The normal period of recovery is from four to six weeks. As these breaks were not complicated, we can assume that this period was sufficient to accomplish the complete reunion of the ribs.

When she left the hospital at the end of twelve days, she was able to sit up, but because of weakness could not dress herself. She complained of weakness in her right side. This condition retarded her improvement.

Dr. Abramson says that her general condition at that time was good; that outside of the pain and broken ribs her physical injuries were of a minor character.

Both Drs. Herold and Abramson say that from observations made during the course of the trial she looked well and appeared in ordinary normal health. Dr. R. E. Smith says that following the accident her weight went down from 125 or 130 pounds to 110, but admits that at the time of trial she weighed about 138 or 140. Also at the time of trial the children had been brought back to the mother.

The most serious injuries claimed are the effects of the shock and injury upon the nervous system and mental attitude of plaintiff.

During her stay at the North Louisiana Sanitarium, Dr. Herold found her suffering considerably from the shock. She was depressed, very nervous, and trembling to such an extent that she required assistance in everything that she attempted to do. Dr. Abramson testifies that this nervous condition was to be expected following such a trying accident, but that he sees no reason why she should not have recovered from it. But Dr. R. E. Smith, eye, ear, nose, and throat specialist, connected with the Minden Sanitarium, testified: That upon returning home Mrs. Crutsinger's nervous condition failed to improve. Upon his recommendation she was placed under the care of Dr. Duncan, nerve specialist, at the Highland Sanitarium, where she remained two weeks. Upon returning home, no improvement was apparent; she lost weight, going from 125 to 110 pounds, was unable to sleep or eat, unable to attend to her affairs or her chil-

dren, in whom she appeared to have lost interest. To secure quiet and rest, she went to Dubberly to stay with her father; her children going to stay with her sister, Mrs. Woodard at Arcadia. After any excitement or undue exercise, she has to go to bed because of severe headaches. That Dr. Duncan fears intercranial pressure from some internal head injury. She complains constantly of pains in the shoulder and back.

Though plaintiff was sent to the Highland Sanitarium to be treated by its nerve specialist, Dr. Duncan, and was so treated by him, he is not offered as a witness by plaintiff, nor is his absence accounted for. Instead, Dr. Lloyd is placed upon the stand. He announces that he is not a nerve specialist and refuses to testify as such. He does say that she came to the sanitarium on June 31st, and stayed until July 10th, for treatment for nervous breakdown; that her nervous condition was very apparent; that she was unable to eat and was placed upon a special diet. She also complained of constant pain in her right side and shoulder. The treatment given her did not result in any material improvement. Women are more susceptible to nervous breakdowns than men.

About August 1st, she was placed under the care of Dr. R. C. Young, a specialist in nervous and mental diseases, having office in Shreveport. She complained to him of severe headaches and nervous irritability with periods of depression, inability to sleep well, and excitability. He diagnosed her trouble as neurosthenia, with the accident as the probable precipitating factor. He was acquainted with Mrs. Crutsinger before the accident, and then considered her perfectly normal and healthy.

He finds her headaches due to her nervous condition and not any original trouble. During the eight or ten weeks prior to the trial, he had treated her five or six times. She has made slight improvement. In weight she appears about the same as before the accident. He finds from her present condition that she may go along for months and do everything in the ordinary way without trouble and then some small factor might bring on a recurrence of her trouble so that she could not attend to the ordinary affairs of life. As he expresses it, people in her condition are all right until some precipitating factor comes in. Her probabilities of complete recovery are about 60–40.

There is practically no lay testimony except that of plaintiff herself concerning her mental and nervous impairment. She says that immediately following the accident she suffered excruciating pain; that after eleven days' treatment at the North Louisiana Sanitarium she was carried to her home in Minden; that, because she could not stand any noise or the care and worry of the children, they spent practically the entire summer with her sister at Arcadia; that she herself was incapacitated from running her home, looking after her affairs, or doing anything whatever for herself; that she is living at Dubberly with her father, a retired physician; that June 31, 1931, she went to the Highland Sanitarium Clinic at Shreveport; that previous to this she spent almost ten days in the Minden Sanitarium; that before the accident she was well and able to attend to all of her affairs, both business and household; that since the accident she has not been able to do this; that, whenever she exerts herself, she suffers from severe headaches which she attributes to intercranial pressure; that at the time of injury she weighed about 130 pounds; that she lost 20 or 30 pounds in the first six or eight weeks.

As to the children, Charley, the elder, suffered lacerations of the head, two requiring several stitches, in addition to numerous bruises. He bled profusely, and has been extremely nervous since the accident.

The only testimony of injury to the younger child is that of Dr. Herold, who says that it seemed to be suffering from shock and went to sleep as soon as put to bed. Mrs. Crutsinger says she was worried because this child seemed to be in a coma. In this condition the child suffered no pain. There is no evidence of any physical injury.

Upon this testimony the lower court gave judgment in favor of plaintiff for $500 each on account of the two children, and $7,154.50 for plaintiff herself, apportioned, $5,000 for disfigurement and disability; $1,500 for pain and suffering; $300 for the automobile—leaving $354.50 allowed for expenses.

From this judgment defendant appeals. Plaintiff answers the appeal, praying that the judgment be increased to the amount claimed.

Defendant contends that, if found liable, no damages can be allowed Mrs. Crutsinger for her injuries because she has refused to submit to a physical examination by experts of defendant's choosing; that, if wrong in this, the damages allowed are excessive and should be reduced.

On the question of examination, the record discloses the following correspondence between counsel:

On March 25, 1932, defendant wrote plaintiff requesting that Mrs. Crutsinger and the children come to Shreveport for an examination at the Schumpert Memorial Sanitarium by Dr. George Garrett. They offered to pay all expenses, and asked that plaintiff fix the date.

On April 28th, in answer to this, plaintiff's counsel, though the name of defendant's proposed examiner is given in defendant's letter, requested the name and promised to take the matter up with Mrs. Crutsinger as soon as the name of the proposed examiner is

given. It was stated that delay in answering was due to illness, and that any examination must be made at Arcadia.

On May 5th, defendant replied that Dr. George Garrett would be the examiner. They asked to be informed if Mrs. Crutsinger would consent to submit to the examination, and, if so, when.

On May 6th, plaintiff's counsel wrote that Dr. Garrett would be acceptable, and asked that defendant fix some afternoon for the examination to be held in Arcadia.

On May 18th, defendant replied, urging an examination in Shreveport, but consenting to send Dr. Garrett to Arcadia if Mrs. Crutsinger will say what day she will be there.

Receiving no reply to this, defendant again wrote on September 20th, urging that plaintiff let them know on what date and at what hour Dr. Garrett could examine plaintiff at Arcadia.

September 23d plaintiff's counsel wrote announcing the setting of the case for trial October 13th, but saying nothing about the requested examination.

September 28th defendant's counsel again wrote urging that Mrs. Crutsinger come to Shreveport, where X-ray and other facilities will permit of a more thorough examination.

This letter also elicited no reply.

We think the above correspondence reveals a studied determination on the part of plaintiff's counsel to avoid an examination of his client by defendant's physician. Mrs. Crutsinger testifies that she authorized her attorney to inform defendants that she would go to Arcadia for an examination at her sister's. She says that she took the children out of school and went with them to Arcadia to meet Dr. Garrett; that she stayed all day expecting him, but he did not come. The correspondence makes it clear that the reason he failed to arrive was that defendant had never been told the date she would expect the examination. The correspondence covered a period from March 25 to September 28, 1932. The trial was held October 13, 1932. Dr. Young testified that during the interval of eight or ten weeks prior to the trial Mrs. Crutsinger visited his office five or six times for examination and treatment. No explanation is offered for the failure of plaintiff, on one of these visits, to notify defendant and submit to examination.

The leading case in the state on the question of physical examination by the adverse party is that of Kennedy v. New Orleans Ry. & Light Co., 142 La. 879, 77 So. 777, 778. In this case shortly after the accident a physician selected by defendant was permitted to make a partial examination of plaintiff. Thereafter, by correspondence, counsel for the railway company made the request that plaintiff submit to another examination, which was consented to only on condition

that the testimony of the examining specialist should not be used in defense of the suit. Such a condition defeating its purpose, the examination was not made. During the trial, defendant asked the court for an order directing plaintiff to permit an examination by physicians of the company, which was refused on the ground that the court was without authority to issue such an order. Two experts testified for plaintiff as to examinations made by them. In his opinion, Mr. Chief Justice Monroe, said:

"We find no fault with the ruling of the trial judge to the effect that he was without authority to require plaintiff to permit an examination of her person; but, on the other hand, we do not see how the jury and the judge could reach a legal verdict and judgment against the defendant upon an ex parte version of physical injuries, of the nature and character of which plaintiff permitted only the witnesses selected by herself to become informed; for, if defendants in such cases can be condemned upon that basis, they will always be at the mercy of the plaintiffs, who have only to complain of injuries not visible outside of their clothing, produce themselves and their own selected witnesses to testify to them, and sit tight, with no fear of possible contradiction. Such a proceeding, however, fails to furnish the principal element required in due process of law, to wit, a hearing, and ordinarily would be dismissed, since a court cannot well place a value upon ex parte testimony."

We do not find that this opinion has been subsequently considered by the court of its rendition.

In Bailey v. Fisher, 11 La. App. 187, 123 So. 166, 167, we find the following:

"At the trial defendant's counsel objected to the introduction of any medical testimony by plaintiff's physicians, contending that, under the doctrine announced by our Supreme Court in Grant v. N. O. Ry. & Lt. Co., 129 La. 811, 56 So. 897, and in Kennedy v. N. O. Ry. & Lt. Co., 142 La. 879, 77 So. 777, such testimony, in view of plaintiff's refusal to submit to an examination by defendant's physician, would have been 'ex parte,' and therefore inadmissible.

"The trial judge, following the pronouncements in the two cases referred to, maintained the objection and excluded the testimony. Accordingly there is in the record no testimony or evidence as to the extent of plaintiff's physical injuries. That this ruling of the trial judge is correct and in accordance with the doctrine announced in the cases referred to is manifest."

In Russell et al. v. Celentano, 13 La. App. 708, 129 So. 182, 183, the court held:

"It is not necessary for us to consider the other questions presented, but we cannot overlook the situation created by the refusal

of plaintiffs' counsel to allow physicians selected by defendant to examine the child in an effort to ascertain the extent of the injuries sustained. Under a decision rendered by us in Bailey v. Fisher, 11 La. App. 187, 123 So. 166, and the decisions rendered by the Supreme Court in Kennedy. v. N. O. Ry. & Lt. Co., 142 La. 879, 77 So. 777, and Grant v. N. O. Ry. & Lt. Co., 129 La. 811, 56 So. 897, such refusal, to say the least, throws grave doubt upon the evidence offered by plaintiffs as to the injuries sustained."

In Daste v. First Nat'l Life, Health & Accident Ins. Co., 14 La. App. 565, 130 So. 572, 573, the Bailey Case is cited with approval and as authority for holding that:

"The record shows that the plaintiff had been injured and was paid disability benefits for a period of seventeen weeks, but thereafter refused to submit and still refuses to submit to an examination by the defendant's physician, thus preventing the insurance company from making an adequate investigation to determine its liability by establishing the period of disability that the plaintiff suffered. Had the plaintiff, during the course of the trial, offered to submit to a medical examination, the case might have been different, but he persisted in refusing to be examined, and there was nothing for the court to do but dismiss the suit under the circumstances.

"In view of the above authorities and quoted condition contained in the policy, we are of the opinion that the ruling of the trial court, in holding that the testimony offered to establish the physical injury was inadmissible, is correct."

In the Daste Case, the judgment of the lower court in favor of defendant dismissing plaintiff's suit was affirmed. In the Russell Case, a judgment in favor of defendant was affirmed. In the Bailey Case, the claim for physical injuries was nonsuited. In the Kennedy Case, because of the acquiescence of counsel, a reduced judgment was rendered.

In the present case, from the record as it stands, plaintiff has shown serious mental and nervous injury as a result of the collision. She herself does not appear to be in bad faith or at fault in the matter of her examination by defendant. Her principal claim is for damages based upon the nervous and mental disorder. Rather than nonsuit these claims and try the case piecemeal, we think the cause of justice would best be served by remanding the case for further hearing after plaintiff has accorded defendant a fair and frank opportunity for a thorough physical and mental examination at one of the recognized sanitariums in Shreveport where proper facilities are available; the entire expense of the examination to be borne by defendant. This is not an order directing

plaintiff to submit to a physical examination. The purpose is to give her the opportunity to do so. If she does not see fit to avail herself of it in a reasonable time, the case will be returned here to be disposed of on the record as made up.

The case is accordingly remanded to be proceeded with in accordance with the above views.