80 So.2d 153 (1955)
William H. HARRISON et al., Plaintiffs-Appellants,
v.
PETROLEUM SURVEYS, Inc., Defendant-Appellee.
No. 4017.
Court of Appeal of Louisiana, First Circuit.
April 22, 1955.
Rehearing Denied May 27, 1955.
*154 Harvey Peltier, Donald L. Peltier, Thibodaux, for appellants.
Doyle, Gremillion, Doyle & Smith, New Orleans, for appellee.
TATE, Judge.
Plaintiff-landowners appealed from judgment after trial on the merits dismissing their suit for muskrats killed and damages to muskrat lands allegedly caused by the geophysical explorations conducted thereon by Petroleum Surveys, Inc., defendant-appellee.
Such geophysical exploration operations consist of recording the subterranean reactions to explosions set off about 200 feet beneath the ground at a certain predesignated *155 pattern of points situated over certain territory. The skilled interpretation of these recorded reactions may approximately indicate the presence or absence of mineral potentialities. In marshy country such as is here involved, the surveying, explosion, and recording crews are transported on "marsh buggies"huge, heavy vehicles which churn through the marsh on two sets of two broad (4' wide each) wheels leaving tracks from 18 inches to four feet deep, depending on the softness of the marsh, and approximately twelve feet in width.
By stipulation between the parties, it is admitted that Petroleum Surveys employees did actually trespass specifically without authorization from plaintiff-landowners (hereinafter designated as "the Harrisons") on their property by operating their marsh buggies on approximately two acres of marsh land at the northwest corner of their section, and by firing the shot in question at a depth of 172 feet, after sinking a pipe 190 feet deep. It is further expressly stipulated that this trespass was unintentional and was the result of an honest surveying error.
Petroleum Surveys produced three former employees in an effort to minimize the damage done to the two-acre strip. But taking into consideration that the locationpoint in question was one of many such shots taken on the day in question and over three years before trial, their testimony as to the use of two such marsh buggies to a depth into the Harrison's land of about 200 feet, leaving two tracks each about 50 feet wide or 100 feet in all, together with the testimony of the trapper, trapping supervisor, and owner of the land convinces us, as claimed, that Petroleum Surveys' operations completely crushed the two-acre tract in question and the muskratsupporting 3-cornered grass growing thereon.

1. Admissibility of Evidence.
At the outset, based upon the Harrisons' refusal prior to trial to permit Petroleum Surveys to inspect the area of trespassing, defendant objected to introduction of any evidence whatsoever as to damages sustained by the land in question. By letter of December 15, 1951, concerning also several other matters involved in this lawsuit, counsel for defendant had included a request for permission of a surveyor and expert witness to locate the boundary line and make an estimate of the continuing nature of the damages allegedly sustained by the land. This request was refused for certain grounds not here material, and the matter was not re-urged before trial of the merits on February 11, 1952, when defendant simply objected to admission of any such evidence and did not again request permission to go upon the land. The trial continued on February 12, 1952, and was concluded on April 21, 1952.
Petroleum Survey's objection is based upon similar rulings excluding evidence in personal injury jurisprudence where plaintiffs refused to be examined by physicians selected by the defendant or appointed by the court, see Grant v. New Orleans Ry. & Light Co., 129 La. 811, 56 So. 897; Kennedy v. New Orleans Ry. & Light Co., 142 La. 879, 77 So. 777; Bailey v. Fisher, 1929, 11 La.App. 187, 123 So. 166; Russell v. Celentano, 1930, 13 La.App. 708, 129 So. 182; Daste v. First National Life, Health and Accident Insurance Company, 1930, 14 La.App. 565, 130 So. 572; Ritter v. National Life and Accident Insurance Company, La.App., 198 So. 280. But the Supreme Court cases cited concern repeated refusals to submit to examination even by court-appointed physicians, and also involve the constitutional sanctity of a citizen's person. And the courts will not apply this doctrine arbitrarily to exclude evidence of damages upon simple proof of refusal to submit to examination, but have instead inquired into all the circumstances to see whether such refusal was reasonable or excusable, Holley v. Louisiana and Arkansas R. Co., La.App., 155 So. 790, Stewart v. Security Industrial Life Insurance Company, 3 La.App. 256.
In the case before us, the request to view was made once as a routine request without any indication that defendant would *156 upon refusal invoke the harsh sanction here sought, nor did the defendant seek the assistance of the court in obtaining access to such information. We do not believe that such drastic consequences as exclusion of testimony of damages should result from the refusal of an unreiterated and apparently routine request to view. The District Court admitted the evidence subject to this exception, which he did not specifically rule upon, but which we overrule.
It should be added that the doctrine referred to by defendant is no longer applicable; or, rather, has been formalized and statutorily adopted by the "Depositions and Discovery Act", 202 of 1952, LSA-R.S. 13:3741, see sections 13:3782(2) and 13:3783 making available mandatory discovery procedure to view the scene of the trespass or have examinations made of injured parties.

2. The Muskrat.
The evidence presented describes the muskrat as a small (2 lb.) fur-bearing animal, living in marshy areas. It feeds on the roots of certain grasses, which it eats from tunnels under the ground dug by itself. The muskrat lives underground in nests, and prefers areas with ground firm enough to support grass, but not so firm as to impede its digging processes. It also prefers areas upon which certain types of grass grow, such as "3-cornered" grass. The male inhabits the nest with the female. An external manifestation of this nest may be a "muskrat hill", which may also indicate four or five or more such combined nests. The muskrat breeds monthly a litter of 2-4 kittens, constructing a new chamber to its nest for each such litter.
The trapping of muskrats for their pelts on the four million marsh acres in southern Louisiana is an important economic activity of our State.

3. The Factual Consequences of the Trespass.
The Harrisons' witnesses consisted of the owner, trapping supervisor, and trapper of the 2-acre tract in question, and several other experienced trappers and trapping superintendents. They testified that the operation of marsh buggies over muskrat lands such as are here involved will kill many of the muskrats and their litters in tunnels and nests, since the muskrat upon approach of danger hides in his underground tunnels (and since the marsh buggy trails go deeper than the tunnels of the muskrat hill). These operations also destroy the rich three-cornered grass upon which they feed. Because of this destruction and of the packing of the ground, they testified that such muskrat lands would not be good for trapping for from 8 to 15 or more years thereafter.
Most of these witnesses were also familiar with the land here involved. They testified that due to the plentiful 3-cornered grass and the right softness of the soil, it was good muskrat land. They estimated that approximately 600-1000 muskrats, including young, inhabited these two acres, and that several hundred would be killed by operation of the marsh buggies upon the land in question. While one of the three Petroleum Surveys crew members testified that it was not good muskrat land, and the other two also testified they did not see any muskrats, as admitted by these witnesses, their job was not to look for muskrats but to shoot many exploration points per day.
Petroleum Surveys sought to contradict this factual testimony mostly by the testimony of an expert biologist specializing in marsh ecology and fur animal habitats, who had published several works, made several surveys, and had engaged in trapping supervision and activities himself. While on direct examination the estimates of this witness were conservative as to the amount of muskrat produced by given acreages or the amount of damage caused by marsh buggies to muskrat potentialities of a given tract of land, on cross-examination approximately two months later based to a great degree upon disparate findings in his published works, it developed that one explanation for the discrepancies between his testimony and that of plaintiffs' witnesses was that the expert had based his *157 measurements on extremely large tracts of land (say one hundred thousand acres) in which necessarily the major portion would be bayou, bay, or otherwise unsuited for muskrat operations.
Under cross-examination, this expert admitted that well-suited land could produce from 40-70 muskrats per acre in trapping operations. The Harrisons' witnesses directly concerned with trapping operations on these two acres testified that upon this tract were maintained 20-25 traps which produced an average of 100 muskrats per year, or an average of 50 muskrats per acre. The other trappers and trapping supervisor witnesses testified to the effect that good marshland such as this tract could reasonably be expected to produce approximately 50 muskrats per acre per year.
We feel that the plaintiffs have established by a preponderance of the evidence that two-acre tract damaged by Petroleum Surveys was good muskrat land and could reasonably have been expected to produce through trapping operations an average of 100 muskrats per year. It is not seriously denied that over the last several years the landowner's net profit per muskrat pelt would be 57-58¢.
Defendant's expert testified that marsh lands can be restored to full production after marsh buggy destruction in at the latest 3-4 years. The Harrisons testified that from previous experience it took 15 or more years after the incident to restore the lands to full production. Two of plaintiff's witnesses, Eunice J. Vinet and Alidore Mahler, trapping operators with probably the most extensive practical experience concerning such marsh buggy damage of those testifying (aside possibly from the expert), stated that marshland similar to the present was generally restored to full muskrat production within 8-10 years. This latter estimate we will accept as fairest to all parties.
4. Legal Cause of Action for Damage to Muskrat Lands.
The chief defense to this action urged by Petroleum Surveys is its contention that by law the Harrisons had no cause of action for the damages alleged because as a matter of law the landowner has no property interest in the muskrats themselves while still untrapped. Muskrats, being wild animals, are owned by the State of Louisiana while still at large, LSA-R.S. 56:101, 56:102, 56:252; and wild beasts in general belong not to the landowner, but to the captor no matter upon whose land captured, Article 3415, LSA-C.C.
It was this contention the District Court sustained in dismissing the landowners' suit.
While the landowner does not own the muskrats situated on his property, he owns the exclusive right to take muskrats therefrom, Esmele v. Violet Trapping Co., 187 La. 728, 175 So. 471, Curran v. Jones, 163 La. 579, 112 So. 492, Rosenthal-Brown Fur Company v. Jones Frere Fur Company, 162 La. 403, 110 So. 630.
Defendant skillfully urges that these cases hold that only trespassers in bad faith are held liable for muskrats taken from another's land, and then only for the profits derived therefrom under the principle of restoring the fruits of unjust enrichment, Article 1963, LSA-Civil Code. Some language in these cases might be so construed. But the facts of the Curran and Rosenthal-Brown cases cited involve a determination of the measure to be used in the accounting by possessors under (what was subsequently held to be) inferior title to the true owners of the land for profits derived by the wrongful possessors during their possession thereof.
The Esmele case simply awards the true lessee the estimated profit on pelts taken by a wrongful trespasser (a trapping company) without discussion as to legal good or bad faith, see Esmele v. Violet Trapping Company, 184 La. 491, 166 So. 477 on merits. It is not authority for the proposition that the owner of muskrat lands cannot recover from the trespasser for damages occasioned thereby, but rather the contrary. The wrong or damage to the rightful possessor occasioned in the Esmele case was the wrongful trapping of muskrats by the trespasser *158 on the lease-owner's muskrat land, and the trespasser was held in damages to the lease-owner for the estimated profits the lease-owner lost through the trespasser's wrongful act and not for profits on pelts taken by the trespasser. See 166 So. 479.
Negligence is a violation of a relative right, and trespass a violation of an absolute one: but, under Article 2315, LSA-C.C., either wrongful act entitles one injured thereby to recover the damages occasioned him thereby. Through this wrongful act (trespass) of Petroleum Surveys, the landowner has suffered provable damage and is entitled to recover therefor. While punitive damages may be recovered when the trespass is intentional or willful or wanton, Nickerson v. Allen Brothers & Wadley, 110 La. 194, 34 So. 410, see also Grandeson v. International Harvester Credit Corporation, 223 La. 504, 66 So.2d 317 and, La.App., 61 So.2d 550; only compensatory damages are awarded in unintentional trespasses as this. To this extent only in damage suits arising out of trespasses is considered the question of legal good or bad faith, so important in the sometimes related question of measuring recovery by the true owner from the possessor of fruits, profits, and revenues derived from the latter's wrongful possession.
The Harrisons sought recovery for (1) 500 muskrats killed in the ground by Petroleum Surveys' operations; (2) loss of 1,500 muskrats, over 15 years.
Petroleum Surveys correctly urge that the Harrisons cannot recover for the muskrats killed in the ground by defendant's operations. The property right of the landowners' damage is not the muskrats themselves (which do not belong to them) but the economic value of the right to trap muskrats on the land in question.
Petroleum Surveys also urge that for this same reason, at least as pleaded, the Harrisons cannot recover damages, since they are seeking payment for 1,500 muskrats to be captured in the future, over fifteen years. But the petition pleads, Article 21: "That because of the destruction of said muskrat hills and the damages to the surface of the land, the land has become valueless for trapping purposes for a period of 15 years." Under Article 22, the petition originally itemized this damage as "loss of fur revenues for 15 years and damages to the land". In response to defendant's exception of vagueness, this itemization was further explained as loss of profits from 100 muskrats a year for 15 years. (The evidence indicates that muskrat lands are leased, not at so many dollars per acre, but at so much per cent of the price received for each muskrat subsequently trapped thereon during the life of the lease.)
Contrary to the contention of Petroleum Surveys that any recoverable damages could only have been pleaded as the restoral cost for the acreage, or the value of 3-cornered grass on the tract, we feel that plaintiffs have adequately pleaded the damage sustained by them through defendant's trespass. This damage is not only the value of the grass destroyed, but is really the damage to the property right representing the chief economic value of this small tract its ability to produce muskrats in trapping operations, measured by the loss of muskrat revenues reasonably to have been expected therefrom had the trespass not occurred.

5. Award.
In cases where although there is a legal right to recovery, an exact estimation of damages cannot be made, courts have discretion to assess same based upon all the facts and circumstances of the case, see, for instance, Brantley v. Tremont & Gulf Railway Company, 226 La. 176, 75 So.2d 236, involving damages occasioned by causing overflow of minnow pond and loss of minnows therein. As previously discussed in detail, in evaluating the economic loss occasioned to the Harrisons by destruction temporarily of the value of this small tract for muskrat trapping purposes through defendant's unauthorized trespass, we feel an award based on loss of 100 muskrats per year, over a period of 8 years, at an average loss of profits to plaintiffs of 57¢ per muskrat, or $456 in all, will be a fair award under *159 all the facts and circumstances as shown by the evidence herein.
For the reasons above assigned, the judgment of the District Court herein is reversed, and judgment is rendered in favor of plaintiffs, William H. Harrison, Walter J. Harrison, and Mrs. Lydia Harrison Knight, and against the defendant, Petroleum Surveys, Inc., in the full sum of Four Hundred Fifty-Six and No/100 Dollars, together with legal interest thereon from date of judicial demand until paid. Defandantappellee is cast with all costs of this appeal and of these proceedings, including the expert fees fixed by District Court. Reversed and rendered.