803 So.2d 86 (2001)
TERRE AUX BOEUFS LAND CO., INC.
v.
J.R. GRAY BARGE COMPANY, Henry's Marine, Tetra technologies, INC., Zurich insurance Company, ABC Insurance Company, and DEF Insurance Company.
No. 2000-CA-2754.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 2001.
*88 Benjamin O. Schupp, Sergio J. Alarcon, Charles A. Snyder, Milling Benson Woodward L.L.P., Orleans, LA, Counsel for Plaintiff/Appellee.
Lee M. Peacocke, Salley & Associates, Metairie, LA, Counsel for Defendant/Appellant, Henry's Marine Service, Inc.
Ruth B. Schuster, Robert T. Lemon II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, L.L.P., New Orleans, LA, Counsel for Defendant/Appellant, Tetra Technologies, Inc.
Brandon E. Mary, Lemle & Kelleher, New Orleans, LA, Counsel for Defendants/Appellants, J.R. Gray Barge Co., and Zurich Ins. Co.
Court composed of Judge STEVEN R. PLOTKIN, Judge DENNIS R. BAGNERIS, Sr., Judge MICHAEL E. KIRBY.
PLOTKIN, Judge.
The salient issue presented by this appeal is whether a landowner is entitled to issuance of an injunction compelling removal of a barge stranded on its property as a result of Hurricane Georges. Defendants, Gray Barge Co. ("Gray"), Zurich Insurance Co. ("Zurich"), Henry's Marine ("Henry's"), and Tetra Technologies, Inc. ("Tetra"), appeal the trial judge's grant of preliminary injunctive relief in favor of plaintiff, Terre Aux Boeufs Land Company, Inc. ("TAB"). For the reasons explained below, we affirm the trial court's judgment in part, reverse in part, and render.

FACTS
Barge RG-7, an unmanned, non-propelled, deck barge used for transportation and storage of construction materials, was owned by Gray Barge Co., who entered *89 into a charter for use of the barge with Henry's on August 28, 1998. Henry's subsequently chartered the barge to Tetra, which used the barge for drilling operations. When Hurricane Georges threatened the Gulf region, Barge RG-7 was moored to the Breton Sound Fuel Dock at Hopedale, Louisiana. As a result of the hurricane, the barge broke from its moorings and became stranded on TAB's marshland property, approximately 1,000 feet from the nearest navigable waterway. Subsequently, Gray Barge Co. claimed a constructive total loss of the barge and was indemnified by its underwriter, Zurich Co. The barge was then abandoned by all defendants.
On September 27, 1999, TAB filed a Petition and Rule to Show Cause in the 34th Judicial District Court for the Parish of St. Bernard against the defendants. TAB set forth five separate causes of action for injunctive relief to compel removal of the barge: (1) a possessory action under La. C.C.P. art. 3663; (2) a pollution action under LSA-R.S. 30:2076 and LSA-R.S. 30:2077; (3) a pollution action under LSR.S. 30:2155; (4) a pollution action under LSA R.S. 30:2202 and LSA-R.S. 30:2203; and (5) a general tort liability action under La. C.C. art. 2315, La. C.C. art. 2316, La. C.C. art. 2317, and La. C.C. art. 2317.1. Gray Barge and Zurich Co. responded by filing an Exception of No Cause of Action, which was denied by the trial judge. Gray and its insurer, Zurich Co., filed a crossclaim against Henry's and Tetra. TAB's Motion for Preliminary Injunction came for a hearing on February 28, 2000. Following the hearing, the trial judge entered judgment granting TAB's petition for preliminary injunctive relief against all defendants.
In entering judgment in favor of TAB, the trial judge made the following legal and factual findings.
1. That "[m]aritime jurisdiction extends to this claim despite the fact the barge is no longer in navigable waters and is actually on land" by virtue of the Admiralty Extension Act, 46 U.S.C. Section 740.
2. That the claim was properly maintained in state court pursuant to the Savings to Suitors Clause, 28 U.S.C. 1333, "with federal maritime law being applied."
3. That state substantive law may be used to fill "gaps" in coverage if no maritime law provision controls, provided the state remedies selected do "not make changes in substantive law." Miller v. American Dredging Co., 595 So.2d 615 (La.1992), aff'd, American Dredging Co. v. Miller, 510 U.S. 443, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994).
4. That "the present circumstances of this case constitute a gap in maritime law which is filled by various state remedies. Specifically, plaintiff's claim for injunctive relief for removal of the barge from his land is not controlled by federal maritime law."
5. That TAB is entitled to peaceful possession of its property under Louisiana law and that it could therefore assert an action for removal of the barge.
6. That application of state law remedies do not make changes to the substantive federal maritime law.
7. That the presence of the barge on TAB'S property constitutes an unintentional trespass under Louisiana state law.
8. That each defendant is liable for removal of the barge because they were "engaged in the commercial operation of the barge for a profit."
9. That the Federal Wreck Act, 33 U.S.C. Section 409, could be applied *90 to this case by analogy because "[i]t is clear that there is no basis in maritime law for any distinction between a vessel wrecked on land or water."
10. That the "Act of God" defense applies to this case to relieve the defendants of liability "for damages which occurred in the placement of the barge on plaintiffs immovable property."
11. That the defendants have a duty to remove the barge despite the validity of their "Act of God" defense because the 1986 amendments to the federal Wreck Act "create[ ] a duty on the part of the owner, operator/lessee of a wrecked vessel to remove a wreck at their cost regardless of the cause of the wreck." (Emphasis in original.)
12. That a valid bareboat charter existed between Gray and Henry's, thus Henry's was the owner pro hac vice, and that Henry's then subleased the barge to Tetra, but that the charter terminated due to the doctrines of frustration and impossibility when the barge was grounded.
The parties raise a number of issues on appeal, including the following:
1. Application of Louisiana state law remedies in this admiralty case
2. Application of the traditional "Act of God" defense
3. Application of the federal "Wreck Act"
4. Application of Louisiana trespass law
5. Application of Louisiana procedural law relative to possessory actions
6. Status issues between the various defendants

CHOICE OF LAW
The United States Constitution, Art. III, § 2, cl. 1 provides that federal judicial power "shall extend ... to all Cases of admiralty and maritime Jurisdiction." However, admiralty and maritime plaintiffs are allowed to bring suits in state court pursuant to the Saving to Suitors Clause, 28 U.S.C. 1333, which states as follows:
That the [federal] district courts shall have original jurisdiction, exclusive of the courts of the states, of any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.
The United States Supreme Court has explained that the entitlement or "`right of a common-law remedy,' so saved to suitors, does not ... include attempted changes by the states in the substantive admiralty law, but it does include all means other than proceedings in admiralty which may be employed to enforce the right or to redress the injury involved." Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 123, 44 S.Ct. 274, 68 L.Ed. 582 (1924). Generally, "[a] maritime claim brought in the common law state courts .... is governed by the same principles as govern actions brought at admiralty, i.e., by federal maritime law." Powell v. Offshore Navigation, 644 F.2d 1063, 1065 n. 5 (5th Cir.1981). However, the Louisiana Supreme Court stated as follows in Miller v. American Dredging Co., 595 So.2d 615 (La.1992), aff'd, American Dredging Co. v. Miller, 510 U.S. 443, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994):
[I]t is well settled that a state court, having concurrent jurisdiction with the federal courts as to in personam admiralty claims, is free to adopt such [state] remedies, and to attach to them such incidents as it sees fit so long as it does *91 not attempt to make changes in the substantive maritime law."
Id at 617-18.
The Louisiana Supreme Court provided further guidance for deciding whether federal or state law controls in Milstead v. Diamond M Offshore, Inc., 676 So.2d 89 (1996), as follows:
[T]he key consideration in determining whether state laws apply in maritime cases is uniformity. Nonetheless, this demand for uniformity is not inflexible and does not totally preclude application of state laws.... [T]he decision whether to apply a state rule must be based upon a balancing of state and federal interests."
Id at 94. The Milstead court also noted that "[a]nother consideration ....that has recently been given significant credence by the United States Supreme Court is the procedural/substantive distinction." Milstead, 95-2446 at 9, 676 So.2d at 94, quoting American Dredging Co., 510 U.S. at 457, 114 S.Ct. 981 (Souter, J., concurring). A law that either establishes new rules, rights and duties or changes existing ones is substantive, while one that prescribes a method for enforcing a substantive right and relates to the form of the proceeding or the operation of the laws is procedural. Id. at 95. Generally, state procedural laws may be applied to admiralty cases, while substantive laws may be applied only if they are not inconsistent with substantive maritime law. Moreover, "Louisiana courts may afford a remedy not traditionally found in the maritime law, provided that the remedy neither conflicts with substantive maritime law nor impermissibly interferes with the requirement of uniformity." Green v. Industrial Helicopters, 593 So.2d 634, 639 (La.1992). Thus, the trial judge was allowed to apply Louisiana law so long as the above principles were not violated.

ACT OF GOD DEFENSE

Federal Admiralty/Maritime law
The application of the Act of God defense under federal admiralty law was recently explained in Skandia Insurance Co. v. Star Shipping AS, 173 F.Supp.2d 1228 (S.D.Ala.2001), which also involved damages allegedly caused by Hurricane Georges, as follows:
Defendants have pleaded the defense of "Act of God" as a complete bar to any liability, to rebut the Plaintiffs' allegations of negligence. In admiralty law, such overwhelming forces as those characteristic of Hurricane Georges are generally considered "heavy weather" and may be sufficient to successfully invoke the defense of "Act of God." The U.S. Supreme Court, in The Majestic, 166 U.S. 375, 17 S.Ct. 597, 41 L.Ed. 1039 (1897), defined "Act of God" as a "loss happening in spite of all human effort and sagacity." This defense has been widely defined as "[a]ny accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains, or care, reasonably to have been expected could have been prevented;" and/or "a disturbance ... of such unanticipated force and severity as would fairly preclude charging ... [Defendants] with responsibility for damage occasion[ed] by the [Defendants'] failure to guard against it in the protection of property committed to its custody." See 1A C.J.S. Act of God at 757 (1985); and, Compania De Vapores Insco S.A. v. Missouri Pacific R.R. Co., 232 F.2d 657, 660 (5th Cir.1956), cert. den., 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956). However, the "Act of God" defense "applies only to events in nature so extraordinary that the history of climatic variations and other conditions in the *92 particular locality affords no reasonable warning of them." See Warrior & Gulf Navigation Co. v. United States, 864 F.2d 1550, 1553 (11th Cir.1989) (citing to Bradford v. Stanley, 355 So.2d 328, 330 (Ala.1978)) (citing Gulf Red Cedar Co. v. Walker, 132 Ala. 553, 31 So. 374 (1902)).
Notably, hurricanes, such as Hurricane Georges, are considered in law to be an "Act of God." Even though storms that are usual for waters and the time of year are not "Acts of God," a hurricane that causes unexpected and unforeseeable devastation with unprecedented wind velocity, tidal rise, and upriver tidal surge, is a classic case of an "Act of God." However, forecasting the tracks, speeds and tidal surges of a hurricane is one of the most challenging and difficult tasks encountered by meteorologists, and despite aircraft, land, and shipboard reconnaissance, weather satellites, and other data sources, exact hurricane paths and associated flooding are rarely predicted with precision. See WILLIAM J. KOTSCH, WEATHER FOR THE MARINER 151 (2d ed. 1977). Instead, hurricane tracks exhibit "humps, loops, staggering motions, abrupt course and/or speed changes, and so forth[,]" which in turn, alter flood predictions. Id. As a result, determining liability for losses resulting from "Acts of God" are highly fact-specific and the court's ultimate conclusions should turn on whether the weather conditions were foreseeable as "U.S. courts do not find foreseeable risks to be perils of the sea." See Thyssen, Inc. v. S.S. Eurounity, 21 F.3d 533, 539 (2d Cir.1994).
* * * * *
A defendant may be found negligent but still be exonerated from liability of the "Act of God" if it would have produced the same damage, regardless of that negligence, because the defendant's negligence was not the proximate cause. See Warrior, 864 F.2d at 1553 (citing to Glisson v. City of Mobile, 505 So.2d 315, 319 (Ala.1987)). Accordingly, regardless of the type of "heavy weather," "it is certain that human negligence as a contributing cause defeats any claim to the `Act of God' immunity[,]" because an "Act of God" is not only one which causes damage, but one as to which reasonable precautions and/or the exercise of reasonable care by the defendant, could not have prevented the damage from the natural event. See GILMORE AND BLACK, THE LAW OF ADMIRALTY at 163-64. Indeed, an "Act of God" will insulate a defendant from liability only if there is no contributing human negligence and the defendant has the burden of establishing that weather conditions encountered constituted an uncontrollable and unforeseeable cause by "Act of God." See Freedman & Slater, Inc. v. M.V. Tofevo, 222 F.Supp. 964 (S.D.N.Y.1963).
Id. 173 F.Supp.2d at 1239-1240 (footnotes omitted).

Louisiana law
The seminal modern Louisiana case on the Act of God defense is Rector v. Hartford Accident & Indemnity Co., 120 So.2d 511 (La.App. 1 Cir.1960), which adopted the following definition of an "Act of God," originally stated in Southern Air Transport v. Gulf Airways, 215 La. 366, 40 So.2d 787 (1949):
"An Act of God in the legal sense that which will excuse the discharge of a duty and relieve a defendant from liability for injuryis a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable *93 prudence, diligence and care, or by the use of those means which the situation renders reasonable to employ* * * Fortuitous event is that which happens by a cause which we cannot resist."
Id. at 514-15.

Application of principles
As indicated by the above cases, the Act of God defense applies only if the following circumstances exist: (1) the accident is "due directly and exclusively to natural causes without human intervention", and (2) no negligent behavior by the defendant[s] contributed to the accident. In the instant case, the trial judge found that the stranding of the barge on TAB's property was due to an Act of God, Hurricane George, and that no negligent behavior on the part of any of the defendants contributed to the accident. TAB does not challenge either of those findings in this court. Thus, the trial judge properly found that the accident that resulted in the stranding of the defendants' barge on TAB's property was an Act of God. All parties to this appeal agree to this finding.
The defendants claim, however, that the trial judge improperly applied the Act of God defense. The trial judge found that the defendants were relieved of liability for property damage caused by the stranding of the barge, but that they were nevertheless responsible for removal of their barge. The defendants claim that proper application of the Act of God defense mandates that they be relieved from all liability in this case.
We disagree. The defendants have cited numerous federal admiralty cases and Louisiana cases that have applied the Act of God defense to shield defendants from liability for property damage caused by an Act of God. For example, the brief filed by Tetra cites cases applying the Act of God defense to relieve defendants of all of the following types of damages: collisions, wharf damage, oil spills, cargo damage, and vessel sinking/wreck removal. However, none of the cases cited by the defendants deal with the exact question presented by this case-i.e., whether the defense applies to relieve defendants of the responsibility of removing their barge from TAB's property. Moreover, we have been unable to find any cases on that issue. Accordingly, we will consider the issue as res nova, and seek to apply the principles underlying the Act of God doctrine to the facts of this case.
As is clear from the principles quoted above, the purpose of the Act of God defense is to relieve a defendant from liability for damages when the following elements are present: (1) the damages claimed were caused by the Act of God, and (2) no amount of prudence or care on the part of the defendant could have prevented the damages from occurring. The trial judge in this case implicitly found that Hurricane Georges was an "Act of God," and that no amount of prudence or care on the part of the defendants could have prevented the property damage caused by the stranding of the barge on TAB's property. However, the trial judge also implicitly found that the defendants' decision to abandon the barge on TAB's property was not caused by an Act of God, and that the exercise of prudence and care on the part of the defendants could have prevented the continuing presence of the barge on TAB's property. Accordingly, the trial judge found, the Act of God defense does not relieve the defendants from responsibility for removal of the barge from TAB's property.
We agree with the trial court's implicit decision. The abandonment of the barge was unrelated to Hurricane Georges. The record reveals that Tetra representatives were aware that their barge had been *94 stranded on TAB's property before TAB knew. Arnold J. Rodriguez, surface manager for TAB, testified that Tetra's drill supervisor told him that the barge belonged to Tetra immediately after he found the barge on TAB's property. Moreover, Mr. Rodriguez said, Tetra's drill supervisor indicated to him that Tetra would remove the barge that same day. Nothing in the record suggests that the defendants' failure to remove the barge was influenced by Hurricane Georges or any other Act of God. Thus, we find no manifest error in the trial judge's implicit finding that the Act of God defense does not relieve the defendants from responsibility for removal of their barge.

FEDERAL "WRECK ACT"
Although the trial judge specifically found that TAB's "claim for injunctive relief for removal of the barge from his land is not controlled by federal maritime law," he nevertheless decided to apply the federal Wreck Act, 33 U.S.C. § 409, by analogy. The trial judge stated as follows:
The [Wreck] Act may only be applied by analogy because Barge RG 7 is not situated within navigable waters or on the banks of any river or stream. Neither the Wreck Act [n]or general maritime law preclude the operation of state remedies to remove a vessel which is aground on private property. It is clear that there is no basis in maritime law for any distinction between a vessel wrecked on land or water.
We disagree with the trial judge's conclusion that "there is no basis in maritime law for any distinction between a vessel wrecked on land or water." The trial judge's statements ignore Congress's legislative intent, which indeed bears out a distinction. The purpose of the Wreck Act is "preventing obstructions in the nation's waterways." Nunley v. M/V Dauntless Colocotronis, 727 F.2d 455, 462 (5th Cir. 1984). Congress passed the Act in order "to ensure that navigable waterways remained free of obstructions, including sunken vessels." University of Texas v. United States, 557 F.2d 438, 441 (5th Cir. 1977). The Act is designed "to protect, preserve and make safe the nation's navigable waterways." Id. at 453-54. The trial judge improperly found that the Wreck Act should be applied by analogy to the facts of this case, where the barge is stranded on land, some 900 feet from the nearest navigable waterway. Obviously the Wreck Act has no application to this case, either directly or by analogy. Thus, we reverse the trial court judgment to the extent that it finds that the defendants are liable for removal of the barge from TAB's property under the provisions of the Wreck Act.

LOUISIANA TRESPASS LAW
The trial judge also found that defendants are liable to TAB under Louisiana trespass law, stating as follows:
Barge RG-7 is situated on its property without the permission or consent of Terre Aux Boeufs Land Company, Inc. constituting a trespass under Louisiana state law.... Louisiana law recognizes that a trespass can be intentional or unintentional. The fact that the trespass was unintentional does not relieve the trespasser from all responsibility of removal of the vessel from plaintiff's property.
The tort of trespass is defined as the unlawful physical invasion of the property of another. Williams v. City of Baton Rouge, 96-0675 (La.App. 1 Cir. 4/30/98), 715 So.2d 15, 24, rev'd in part on other grounds, 98-2024 (La.4/13/99), 731 So.2d 240; Gaspard v. St. Martin Parish Sewerage Dist. # 1, 569 So.2d 1083, 1084 (La.App. 3 Cir.1990). The Restatement of *95 the Law, Torts, § 158 (1990), sets forth the following rule:
One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally:
(a) enters land in the possession of the other or causes a thing or a third person to do so.
(Emphasis added.) The elements for proving a trespass to land under modern common law are set out, in the alternative, as follows in W. Keeton, Prosser and Keeton on the Law of Torts (5th ed. 1984):
It can be said that, as of now, interests in land, as well as all other interests, are protected by three general tort theories. The three theories are intended to address these situations: (1) the defendant intended an invasion of a legally protected interest; (2) the defendant accidentally, but negligently or recklessly, brought about an invasion of a legally protected interest; and (3) the defendant accidentally caused an invasion of a legally protected interest in the course of engaging in some kind of activity, such as an abnormally dangerous activity, for which a limited strict liability is imposed. The term trespass has occasionally been used to mean any actionable entry on land.
Id. at § 13, p. 69. The same general rule was set out as follows in F. Harper, F. James, and O. Gray, The Law of Torts (2d ed. 1986):
At the present time liability for causing directly a physical invasion of land is generally held to require either (1) an intent to do the act that itself constitutes, or inevitably causes, the intrusion[,] (2) negligence or restlessness that causes the intrusion, or (3) abnormally dangerous conduct or activity that cause the intrusion.
Id., vol. 1, § 1.3, p. 10. Because this case does not involve dangerous conduct or activity, the third element stated above is not applicable.
Although no Louisiana court has previously adopted the rules set forth above, a review of Louisiana cases involving civil torts, though sparse, reveals that the above rules do apply in Louisiana because intent and/or negligence must be proven before a defendant may be held liable for trespass. Concerning intent, civil trespass is generally considered to be an intentional tort, requiring proof that the defendant took some intentional action that resulted in harm to the plaintiff. See the following cases that specifically characterize trespass as an "intentional tort": Robertson v. State ex rel. Department of Planning & Control, 32,309, p. 14 (La.App. 2 Cir. 12/10/99), 747 So.2d 1276, 1284; Weber v. Bon Marche Pharmacy, Inc., 378 So.2d 520, 523 (La.App. 4 Cir.1979); McGee v. Seco Timber Co., 350 So.2d 1265, 1267 (La.App. 3 Cir.1977). Trespass is also listed as an intentional tort in F. Maraist and T. Galligan, Louisiana Tort Law (1996), § 2-6(g) and W. Crawford, Louisiana Civil Law Treatise: Tort Law, vol. 12 § 12.11 (2000). Nevertheless, some Louisiana courts have awarded damages for illegal trespass on one's property, even when committed in good faith. Wendorf v. Corley, 394 So.2d 1252, 1254 (La.App. 3 Cir.1980) and cases cited therein.
In support of the trial judge's finding that the tort of trespass may be committed unintentionally under Louisiana law and jurisprudence, TAB cites two ancient cases-Gliptis v. Fifteen Oil Co., 204 La. 896, 16 So.2d 471 (1943) and Harrison v. Petroleum Surveys, Inc., 80 So.2d 153 (La.App. 1 Cir.1955). In Gliptis, the court found that the defendant had committed a "subsurface trespass" when its drilling operations drifted or deviated *96 from a vertical or upright line so far that the bottom was located on an adjoining owner's property. In Harrison, the court found that the defendant inadvertently trespassed on plaintiffs land as a result of an honest surveying error that resulted in a mistaken impression concerning the location of the property line. However, like the defendant in Wendorf, the defendants in Gliptis and Harrison took intentional actions that lead to the trespass, despite the fact that the defendants did not intend to trespass when they took those actions.
Thus, we find that the rule to be drawn from the Wendorf, Gliptis, and Harrison cases is that a defendant may be held liable for an inadvertent trespass resulting from an intentional act; nevertheless, proof that the defendant took an intentional act remains an important element for proving the plaintiffs claims in those cases. In the instant case, the defendants took no intentional actions that resulted in the stranding of Barge RG 7 on TAB's land. Although the trespass itself might be inadvertent, we find that a defendant generally may not be held liable for trespass under Louisiana law in the absence of evidence that the trespass resulted from some intentional act taken by the defendant.
Nevertheless, there could be one situation in which a defendant may be held liable for trespass even in the absence of intent-i.e. when the plaintiff offers proof that the defendant was at fault in causing the trespass pursuant to the general tort article, La. C.C. art. 2315. See M. Cresson, Comment, "The Louisiana Trespass Action: A `Real' Problem," 56 La. L.Rev. 477 (1995), citing Phillips v. Town of Many, 538 So.2d 745 (La.App. 3d Cir. 1989); Brown v. Bedsole, 447 So.2d 1177 (La.App. 3d Cir.1984). In the instant case, the trial judge found that the defendants were not at fault in the mooring of the barge. In fact, the trial judge found, and the record indicates, that the stranding of the barge was caused solely by an Act of God. Under the circumstances, we find that the trial judge was manifestly erroneous in finding that the defendants are liable to TAB under Louisiana trespass law.
Moreover, even if the trial judge could have imposed liability on the defendants in this case under Louisiana trespass law without finding that fault on the part of the defendants, such a judgment would have been inconsistent with the traditional requirement in maritime law that any finding of liability be based on fault. The general maritime rule was stated as follows in Schoenbaum, Admiralty and Maritime Law (1987):
Liability for collisions, allisions, and other types of marine casualties is based upon a finding of fault that contributed to the damage incurred. From earliest times, this rule has been consistently applied.
Id. at 444. Accordingly, any state law that imposes liability without fault in a maritime case is preempted by federal maritime law. State of Maryland Department of Natural Resources v. Kellum, 51 F.3d 1220 (4th Cir.1995).

POSSESSORY ACTION
The first cause of action asserted by TAB against the defendants was a possessory action pursuant to La. C.C.P. art. 3655 et seq. The trial judge in this case specifically found that TAB "is entitled to the peaceful possession of [its] property."
The general possessory action article, La. C.C.P. art. 3655, provides as follows:
The possessory action is one brought by a possessor of immovable property or of a real right therein to be maintained in his possession of the property or enjoyment *97 of the right when he has been disturbed, or to be restored to the possession or enjoyment thereof when he has been evicted.
The elements that a plaintiff must prove in a possessory action are set forth in La. C.C.P. art. 3658, as follows:
(1) He had possession of the immovable property or real right therein at the time the disturbance occurred;
(2) He and his ancestors in title had such possession quietly and without interruption for more than a year immediately prior to the disturbance, unless evicted by force or fraud;
(3) The disturbance was one in fact or in law, as defined in Article 3659, and
(4) The possessory action was instituted within a year of the disturbance.
The most common issue in a possessory action is whether the plaintiff has proven the first of the above elements-possession. However, in the instant case, none of the defendants claims that TAB did not have possession of the property at the time Barge RG-7 became stranded upon it, or that TAB had had "such possession quietly and without interruption for more than a year immediately prior to" the stranding of the barge. Further, the defendants did not contest the time frame in which the possessory action was instituted. Thus, the only question to be answered is whether the third element listed above has been fulfilled-i.e., whether the stranding of the barge constituted a disturbance in fact or in law. Very little caselaw on this issue exists.
However, La. C.C.P. art. 3659 defines disturbances "in fact" and "in law." Because the definition of "disturbance in law" involves documentary evidence, the facts in this case do not involve a "disturbance in law." However, a "disturbance in fact" is defined as follows: "an eviction, or any other physical act which prevents the possessor of immovable property or of a real right therein from enjoying his possession quietly, or which throws an obstacle in the way of that enjoyment." Although the "act" in this case that prevents TAB from enjoying quiet possession of its property is actually a failure to act-i.e., the defendants' failure to remove the barge, we have no trouble finding that the presence of the barge qualifies as a "disturbance in fact" for purposes of La. C.C.P. art. 3659.
La. C.C.P. art. 3663 specifically provides for an injunction as ancillary relief in a possessory action. Barrilleaux v. NPC, Inc., 97-2040, p. 3 (La.App. 1 Cir. 12/29/97), 704 So.2d 449, 451. Moreover, the imposition of an injunction in a possessory action does not require proof of irreparable harm. Id. Accordingly, we find that the trial judge properly issued an injunction against the defendants in this case ordering the removal of the barge that is disturbing TAB's quiet possession of its property.
We note that imposition of the Louisiana state law remedy provided by the possessory action does not violate any principle of general maritime law because the law governing the possessory action is procedural, as opposed to substantive, law. Milstead, 95-2446 at 9, 676 So.2d at 94. "The characterization of a rule as substantive or procedural is usually the determining factor when deciding whether state or federal law applies in an admiralty case." Id., quoting American Dredging Co., 510 U.S. at 457, 114 S.Ct. 981 (Souter, J. concurring).

STATUS ISSUES BETWEEN THE VARIOUS DEFENDANTS
The only remaining issue is whether the trial judge properly ordered all three of the defendants to remove the barge. The trial judge's findings on this issue are *98 based on his application of the federal Wreck Act by analogy. However, the trial judge found that Gray was responsible for removal of the barge as the non-negligent owner, Henry's was responsible as the bareboat charterer and the owner pro hac vice, and Tetra was responsible as the operator of the barge when it went aground.
All three of the defendants challenge the trial judge's ruling on these status issues. Gray and Zurich argue that Gray has no responsibility as owner of the bareboat-chartered barge and that the trial judge erred in holding that the charter terminated upon the stranding of the barge. Henry's contends that it was a broker or a charterer of a vessel operating under a subcharter, rather than the charterer and owner pro hac vice. Finally, Tetra asserts that no bareboat charter existed between any of the parties.
Under the provisions of La. C.C.P. art. 3656, a possessory action may be brought against "the person who caused the disturbance." In this case, the cause of the disturbance was the failure of the responsible party to remove the barge after it became stranded on TAB's property due to an Act of God. Thus, we must determine which of the defendants was responsible for removal of the barge under maritime principles. However, we have been unable to find any cases either in maritime law or in Louisiana state law relative to responsibility for removal of a stranded marine vessel. Because the fact situation in the instant case is so unusual, we will apply general maritime principles relative to liability for vessels by analogy. Generally, under maritime law, the key issue for determining the liability issues is the nature of the contract between the various defendants. See Agrico Chemical Co. v. M/V Ben W. Martin, 664 F.2d 85, 90 (5th Cir.1981). The Agrico Chemical case explains as follows:
The owner of a barge may, like the owners of other vessels, agree by contract to allow another to use it. This contract, usually called a charter party or charter, may assume a variety of forms. If full possession and control of the vessel is turned over to the charterer, the contract is a demise or bareboat charter. The primary obligation of the owner under such a charter is to furnish a vessel in seaworthy state when it is delivered to the charterer. G. Gilmore & C. Black, The Law of Admiralty 241 (2d ed. 1975). The charterer is regarded as the owner of the vessel for the period of the charter and is responsible for the vessel's operation. Id. at 242.
A "bareboat" or demise charter requires "complete transfer of possession, command, and navigation of the vessel from the owner to the charterer." Gaspard v. Diamond M. Drilling Co., 593 F.2d 605, 606 (5th Cir.1979). A demise is "tantamount to, though just short of, an outright transfer of ownership." Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 208 (1962). It need not, however, be in writing.
A vessel may, of course, be chartered in some other fashion, for example for a single voyage ("voyage charter"), or for a fixed period of time ("time charter"). Typically in the case of conventional vessels, the owner remains in control during such charters, and provides the master and crew. Because barges lack power and usually have no crew, contracts for the mere use of a barge are usually bareboat, A. Parks, supra, at 394, although this is not inevitable. The owner may not only charter the barge but may also provide a tow and remain in control of the barge.

*99 Whatever the nature of the vessel, the rules concerning responsibility for its operation are the same. If the owner retains control, he remains liable for all damages arising out of its operation whether the charter be only for a single voyage ("voyage charter") or for a fixed time ("time charter"). If the charter is a demise, the charterer is responsible. The charter may describe the duties of the parties and provide for the shifting of risks between them, but, in general, control entails responsibility for fault.
Id. at 91. We will seek to determine the liability of the defendants in this case by applying the above principles.

J.R. Gray
Frank Hernandez, Gray's general manager, testified that Gray owned Barge RG-7 at the time it became stranded on TAB's property. However, Mr. Hernandez asserted, the barge had been bareboat chartered to Henry's prior to the stranding, meaning that Henry's and/or Henry's subcharter is liable for the barge. The trial judge found that the agreement between Gray and Henry's was a bareboat charter, but nevertheless held Gray liable, finding that the charter terminated when the barge became stranded.
Gilmore and Black, The Law of Admiralty 216 (1957) states as follows concerning a bareboat charter:
The demise charter (or bare-boat charter) is thus not a documentary device for the conduct of the business of shipping; it is rather an instrument for vesting in one person most of the incidents of ownership in a capital asset of that businessthe ship-while another retains the general ownership and the right of reversion.
Generally, an owner attempting to shift responsibility to other parties by claiming the existence of a bareboat or demise charter has the burden of proof. Guzman v. Pichirilo, 369 U.S. 698, 700, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). "This burden is heavy, for courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship." Id. However, "[a] bareboat charter need not be in writing; control is the critical issue to determine whether a bareboat charter exists." Franicevich v. Caillou Island Towing Company, Inc., 732 So.2d 93, 96 (La.App. 4 Cir.1999). In other words, the bareboat charterer is considered "the owner pro hac vice, just as does the lessee of a house and lot, to whom the demise charterer is analogous." Gilmore & Black, supra at 194. Besides having physical control of the vessel, the charterer must stock it with "a crew, provisions, fuel or supplies-hence the name `bareboat,'" and "a charterer in a bareboat charter must also supply operating expenses." Franicevich, 732 So.2d at 96.
At trial, Mr. Hernandez and Barry Henry, owner of Henry's, testified concerning an August 23, 1998, telephone conversation during which they determined that Henry's would charter the barge, RG-7, from Gray. Mr. Henry testified that he contacted Gray after Tetra contacted him in search of a barge for their operations, and that his conversation with Mr. Hernandez was prompted by that fact. Mr. Hernandez testified that Gray had no knowledge that Henry's subsequently rented the barge to Tetra until after the barge became stranded on TAB's land; however, he admitted that subleasing was a standard practice. Mr. Hernandez stated that in subleasing, it was understood that Henry's was "act[ing] as a broker" and would not offer Gray "information as to who the end line customer is."
The evidence is inconsistent concerning the party that picked up the barge from Gray. Mr. Hernandez initially testified that Henry's picked up the barge from Gray, *100 then stated later in his testimony that either Henry's or "a vessel working under the supervision of Henry's" got the barge. On the other hand, Mr. Henry testified that Tetra picked up the barge. Mr. Hernandez testified that when the barge was picked up, Gray "relinquish[ed] all care, custody, control of the barge."
Gray offered a copy of a bareboat charter agreement with Henry's for Barge RG-7 that had been signed by Mr. Hernandez on August 23, 1998. However, Mr. Henry testified that he did not receive the agreement by facsimile transmission until after the barge had become stranded on TAB's property. In an effort to establish a prior course of dealings with Henry's, Gray offered evidence, including Mr. Hernandez' testimony and copies of bareboat charter agreements, to show that they had previously entered a number of identical agreements, both in writing and not in writing. All of the written agreements were identical to the August 28, 1998, agreement signed by Mr. Hernandez and faxed to Henry's. Mr. Hernandez also testified that Henry's paid pursuant to that agreement for two months-that is, until the barge was stranded.
On the basis of the above evidence, we find no manifest error in the trial judge's finding that the agreement between Gray and Henry's was a bareboat charter that would normally relieve Gray of all liability for operation of the barge. However, the trial judge nevertheless found that Gray was liable because the bareboat charter terminated when Barge RG-7 became stranded on TAB's property, based on the doctrines of frustration and impossibility to charter.
In support of his finding that the bareboat charter terminated when the barge became stranded, the trial judge cited Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365 (5th Cir.1983). In that case, a time charterer brought an action against a chartered vessel's owner and insurer, seeking to recover costs of removing the sunken vessel from property leased by the charterer. The majority of the court on appeal found that the owner was liable for costs of removing the wreck because it had delegated authority for the vessel's operations to the master. In response to a statement by a dissenting judge that vessel was still chartered to the time charterer, the court stated that the "time charter probably terminated when the vessel sank." Id. at 1374. In a footnote, the court explained a finding that the charter was terminated on the sinking of the vessel was "consonant with the traditional application of the doctrines of frustration and impossibility to charter parties." Id., 706 F.2d at 1375, fn. 14, citing G. Gilmore & C. Black, The Law of Admiralty § 4-12 (1975). Apparently in light of the principle stated in Gilmore & Black § 171 that an owner pro hac vice under a bareboat charter is analogous to the lessee of a house, the Continental Oil Co. court also noted that a "change in the condition of leased property, without fault of tenant, which makes property unsuitable for use contemplated by parties, constitutes a breach of the landlord's obligation and permits the tenant to terminate the lease." 706 F.2d at 1375, fn. 14, citing Restatement (Second) of Property: Landlord and Tenant §§ 5.2 & 5.4 (1977).
Although Gray argues that the obvious distinctions between Continental Oil Co. and the instant case demand a different result in this case, we believe that that distinctions do not affect the basic holding that a charter agreement for a marine vessel, like a property lease agreement, is extinguished by frustration and impossibility when the vessel may no longer be used for the purposes for which it was chartered. Accordingly, we find no manifest *101 error in the trial court judgment holding Gray liable as owner of the barge following the termination of the bareboat charter.

Henry's Marine
The trial judge found that Henry's is responsible for removal of the barge from TAB's property as the bareboat charter and owner pro hac vice. However, the evidence in this case clearly demonstrates that Henry's never gained the "possession, command, and navigation" of the vessel necessary to qualify it as the bareboat charterer. Mr. Henry testified that he was acting at all times as a broker for Tetra when he contacted Gray seeking the barge. Moreover, Mr. Hernandez admitted that Henry's often acted as a broker when it entered a charter agreement and passed the boat on to another entity. In Hamilton v. Canal Barge Co., 395 F.Supp. 978 (E.D.La.1975), the court stated as follows:
There is no authority for holding a charterer liable for unseaworthiness when the vessel has been sub-demised and the unseaworthy condition existed at the time the vessel owner was in possession and was brought into play by the negligence of the sub-demisee. [The defendant charterer who subchartered the vessel] was neither the owner nor the owner pro hac vice.

If a charterer who acts as a broker and subcharters the vessel to another party cannot be held liable for unseaworthiness, the most common basis of liability in a maritime case, Henry's cannot be held responsible for removal of the barge of which it never had possession or control. Accordingly, we reverse the trial court judgment to the extent it enjoined Henry's to remove the barge.

Tetra Technologies
The trial judge held that Tetra is responsible for removal of the barge from TAB's property as operator at the time the barge became stranded on TAB's property. As noted above, the evidence in this case reveals that Tetra's true status in relation to the barge just prior to Hurricane Georges was as bareboat charterer and owner pro hac vice. However, since we have already held that the bareboat charter terminated when the barge became stranded as a result of frustration and impossibility, Tetra has no continuing relationship to the barge to support the trial court judgment imposing responsibility for removal of the barge on Tetra. Accordingly, we reverse the trial court judgment to the extent it enjoined Tetra to remove the barge.

CONCLUSION
The trial court judgment issuing an injunction ordering defendant Gray as owner to remove Barge RG-7 from TAB's property is affirmed. The judgment is reversed to the extent it imposes responsibility for removal of the barge on defendants Henry's and Tetra.
However, we note that TAB will have no cause of action to recover necessary damages to its immovable property that might occur as a result of operations conducted by Gray and Tetra pursuant to the injunction in order to effect removal of the barge from TAB's property. As explained above, the only responsibility borne by Gray as a result of the stranding of Barge RG-7 by Hurricane Georges is responsibility for removal of the barge from TAB's property; the Act of God defense shields Gray from all other liability. Because TAB has insisted that the barge be moved, despite its admission at trial through the testimony of its agent, Mr. Rodriguez, that the presence of the barge has not affected its use of the land, TAB cannot recover any further damage that might necessarily result from the removal of the barge. Any other result *102 would be inconsistent with maritime principles that require liability for damages to be based on fault.
AFFIRMED IN PART; REVERSED IN PART; RENDERED.