HUGHES, J.
 

 |2The plaintiff Matthew Wendelboe appeals a judgment in favor of the defendants, Exxon Shipping Company, SeaRiver Maritime, Inc., and SeaRiver Maritime Financial Holdings, Inc. (hereinafter referred to collectively as “SeaRiver”), dismissing all of his claims with prejudice.
 
 [1]
 
 The defendants have answered the appeal assigning as error the trial court’s failure to award it, as the prevailing party, all taxable costs.
 

 On December 9, 1992 Mr. Wendelboe was aboard the
 
 Exxon New Orleans,
 
 a vessel owned and operated by SeaRiver. Mr. Wendelboe served as the vessel’s chief engineer and safety coordinator. The vessel was in the northern Pacific en route from Valdez, Alaska to Anacortes, Washington. On that date, at approximately 11:30-11:45 a.m., Mr. Wendelboe accompanied the vessel’s chief mate to the main or “weather” deck of the vessel to investigate a noise that had been reported by the vessel’s crewmen at that morning’s safety meeting. Based on past experiences, the plaintiff and the chief mate believed the noise was coming from a water locker door that may have come loose during heavy weather the night before. While the two men were engaged in this activity, a powerful wave struck the vessel and washed the chief mate, who was on the ship’s main deck, into the sea.
 
 [2]
 
 The wave also nearly washed away Mr. Wendelboe, who had remained on the bottom steps of a nearby ladder to “watch for waves.” However, before being struck by the wave, Mr. Wen-delboe, who heard it approaching, braced himself around the rail of the ladder. When the wave struck, he lost his grip on the ladder, was lifted by the wave, “tumbl[ed] in the water”, and landed on the main deck.
 

 | ¡¡Mr. Wendelboe survived the wave but alleges that he sustained serious personal injuries, most significantly to his right wrist. SeaRiver paid Mr. Wendelboe’s maintenance in the amount of $11,240.00, medical expenses in the amount of $17,206.65, and ongoing disability benefits totaling $460,000.00 through the onset of this litigation.
 

 Mr. Wendelboe filed this suit against SeaRiver in November 1995 seeking damages under the Jones Act, 46 U.S.C.
 
 *885
 
 § 688(a), and general maritime law. A bench trial was ultimately held on September 11 and 12, 2007, Additional post trial memoranda were filed and arguments were had at the trial court’s request in October 2007, and again in March 2008. On March 20, 2008 the trial court gave oral reasons for judgment, finding: (1) that neither the plaintiff nor the defendant acted negligently, and (2) the wave that allegedly caused the plaintiffs injuries was an Act of God; and therefore, the defendants were not liable. A judgment in accordance with those findings was signed on August 21, 2008. The trial court also denied the plaintiffs subsequent motion for a new trial. This appeal followed.
 

 The plaintiffs sole assignment of error is that the trial court erred in concluding that his injuries resulted from an “Act of God” that exonerated the defendants from liability.
 
 [3]
 
 The findings of the trial court challenged by this appeal — that neither party was negligent and that the incident was caused by an Act of God-are factual findings subject to the manifest error standard of review.
 

 14ACT OF GOD DEFENSE
 

 Louisiana Law
 

 In
 
 Southern Air Transport v. Gulf Airways, Inc.,
 
 215 La. 366, 40 So.2d 787 (La.1949), the Act of God defense was raised as a defense to liability for an airplane-ground collision. Discussing the defense generally, the supreme court stated;
 

 An act of God in the legal sense — that which will excuse the discharge of a duty and relieve a defendant from liability for injury — is a providential occurrence or extraordinary manifestation of the forces of nature which could not have been foreseen and the effect thereof avoided by the exercise of reasonable prudence, diligence and care or by the use of those means which the situation renders reasonable to employ.
 

 215 La. at 376, 40 So.2d at 791, (citing, 1 Corpus Juris Secundum, verbo Act of God, page 1425 and
 
 Holden v. Toye Brothers Auto and Taxicab Company,
 
 1 La.App. 521). The latest pronouncement from the supreme court regarding the Act of God defense reflects an additional element for the courts to consider in determining its proper application, to wit, whether there was negligence on the part of the defendants:
 

 However, when a force majeure or act of God combines or concurs with the conduct of the defendant to produce an injury, the defendant may be held liable for any damages that would not have occurred, but for its own conduct or omission.
 

 Hanks v. Entergy Corporation,
 
 06-477, p. 14 n. 10 (La.12/18/06), 944 So.2d 564, 575, n. 10 (citation omitted). Thus the determi
 
 *886
 
 nation of the application of the Act of God defense necessarily includes an assessment of any negligence on the part of the defendant(s).
 

 Federal Admiralty/Maritime Law
 

 In
 
 Terre Aux Boeufs Land Co., Inc. v. J.R. Gray Barge Company,
 
 2000-2754 (La.App. 4th Cir.11/14/01), 803 So.2d 86,
 
 writ denied,
 
 01-3292 (La.3/8/02), 811 So.2d 887, a suit for damages resulting from Hurricane Georges, the fourth 15circuit court of appeal addressed specifically the application of the Act of God defense under federal admiralty law. A review of that case and the applicable federal jurisprudence reveals that the same analysis is employed for the application of the doctrine as under Louisiana law. Citing the 1897 United States Supreme Court case,
 
 The Majestic,
 
 166 U.S. 375, 17 S.Ct. 597, 41 L.Ed. 1039 (1897), the court began with the definition of Act of God as a ‘loss happening in spite of all human effort and sagacity.’ Borrowing from and summarizing the more recent relevant federal jurisprudence, the fourth circuit noted:
 

 This defense has been widely defined as ‘[a]ny accident, due directly and exclusively to natural causes without human intervention, which by no amount of foresight, pains or care, reasonably to have been expected could have been prevented’ ...
 

 Terre Aux Boeufs Land Co.,
 
 2000-2754 at p. 6, 803 So.2d at 91. And citing GILMORE AND BLACK, THE LAW OF ADMIRALTY at 163-64, the court concluded:
 

 [Rjegardless of the type of ‘heavy weather,’ ‘it is certain that human negligence as a contributing cause defeats any claim to the ‘Act of God’ immunity[.]’ ... Indeed, an ‘Act of God’ will insulate a defendant from liability
 
 only if
 
 there is no contributing human negligence and the defendant has the burden of establishing that weather conditions encountered constituted an uncontrollable and unforeseeable cause by ‘Act of God’.
 

 Id.,
 
 2000-2754 at p. 7, 803 So.2d at 92. Thus, like Louisiana law, the federal jurisprudence also incorporates the negligence of the defendant(s), if any, in the determination of the application of the Act of God defense.
 

 As clearly indicated by the jurisprudence, the Act of God defense applies only if the following circumstances exist: (1) the accident is
 
 due directly and exclusively
 
 to natural causes
 
 without human intervention, and
 
 (2) no negligent behavior by the defendant(s) contributed to the accident. Te
 
 rre Aux Boeufs Land Co.,
 
 2000-2754 at p. 8, 803 So.2d at 93.
 

 | ^Application of Principles
 

 Appropriately, the trial court in this matter considered the parties’ negligence as well as the nature of the alleged “Act of God” wave in reaching its conclusion that the defense, in this case, exonerated the defendants from liability. The trial court found as a matter of fact that no negligence was proved on the part of either party and also that Mr. Wendelboe’s injuries were caused exclusively as a result of the wave, an Act of God under these circumstances. Notwithstanding the correctness of the trial court’s classification of the wave as a “rogue wave” or Act of God, the record amply provides a reasonable factual basis for its finding that neither the plaintiff nor the defendants were negligent in this incident. We have thoroughly reviewed the entire record and find that the trial court’s findings are not manifestly erroneous.
 

 The record establishes the following with regard to the hierarchy of authority among the ship’s crew. The captain, who at the time of this incident was Keith
 
 *887
 
 Eldridge Hoye, has command over the entire vessel — all of the department chiefs, including the chief mate, head of the deck department, and the chief engineer, head of the engineer department, answered to him. The chief mate was the second in command and the one who would assume the captain’s authority in the event of his absence. The captain of the vessel is the only person authorized to make discretionary calls regarding “posting,” or restricting access to, decks, and also the sole authority to give anyone permission to go on the main deck.
 

 This incident occurred during the winter when the seas are commonly rough. The record establishes that throughout the night preceding the incident, the weather had been stormy and rough. However, by all accounts, on the morning of the incident, the weather was subsiding and conditions were far more moderate and less severe than they had been during the night. Therefore, the crew proceeded to 17perform its normal activities, including having a fire drill and a boat drill.
 
 [4]
 
 Following the drills, the plaintiff, the chief mate, the captain, the third mate, the first and second assistants, and the unlicensed crewmen had a weekly safety meeting in the officers’ lounge. At the safety meeting, while several routine safety issues were discussed, the plaintiff testified that during the meeting he also spent time reading a steering gear casualty report he had received. During the meeting, the captain also announced that a course change was planned for the vessel at approximately 1300 (1:00 p.m.), and cautioned them to ensure that their gear and equipment were secured, as the change in course would cause the ship to roll (move from side to side) more than before. According to Mr. Wendelboe, at the end of the meeting, he stayed behind as he was still reading the steering gear report. He stated that the chief mate and captain had also stayed in the lounge and he overheard them discussing complaints that were brought up at the meeting about a banging noise that had kept some of the crew members up during the night. He testified that when he finished the report and left the lounge to go to the engineer’s office, he ended up walking down the passageway with the chief mate and the captain. He then observed the chief mate going to get his gear. He asked the chief mate if he was going to investigate the noise and when the chief mate said “yes,” Mr. Wendelboe volunteered to go with him so that “together” they could decide what to do. Mr. Wendelboe admitted that he did not first ascertain whether the main deck was posted nor did he seek or receive permission or instructions from the captain, or from anyone else, to go down to the main deck. However, he explained that he assumed the chief mate had gotten permission from the captain, since he clearly was making preparations to do so, and plaintiff had never known the chief mate to violate the procedure of first getting permission from the captain before going out onto the main deck. Other than assuming proper permission had | sbeen obtained by the chief mate, Mr. Wendelboe denied having any specific knowledge of any orders, instructions, or limitations given by the captain to the chief mate regarding investigating the noise. Mr. Wendel-boe fui’ther explained that he personally felt that the chief mate should not go out on the deck by himself and he also thought it made sense for him to participate in the investigation because as chief engineer, he would ultimately be the one responsible for
 
 *888
 
 making whatever repairs proved necessary.
 

 Mr. Wendelboe testified that at approximately 11:30 to 11:45 a.m., he and the chief mate descended the ladder from the poop deck to the main deck, and they both remained on the ladder to observe the seas for approximately three to four minutes. Although the seas appeared moderate and back to normal, Mr. Wendelboe testified that he asked the chief mate if he thought they should wait to go on deck and investigate the noise until after the ship’s planned course change, scheduled for approximately 1:00 that afternoon. According to Mr. Wendelboe, the chief mate responded that he did not see any problem with going down at that time. In fact, the chief mate commented that they were better off attempting to find and repair the cause of the noise at that time since the ship would roll more after the course change.
 

 The chief mate proceeded further down the ladder and onto the deck. Mr. Wen-delboe descended to the bottom or second to last step on the ladder and told the chief mate he would remain there, keeping an eye out for waves. From there, he clearly saw that the noise was indeed coming from a water locker door that had come loose as they had suspected. However, it was not the particular water locker located right next to the ladder, as they had thought, but rather a portable locker farther out on the deck, approximately fifteen to twenty feet away. Thus, Mr. Wendelboe stayed on the ladder, and the chief mate went out onto the deck to the locker with the loose door. Mr. Wendelboe noticed a few waves coming toward l0the ship, including one that actually washed water onto the ship, but none that were over three to four feet high. When he first saw the water coming onto the deck, he hollered out to the chief mate then quickly realized that the wave was not as forceful as he had thought. He then stepped onto the deck and turned aft to let the chief mate know the warning had been a false alarm. As he did so, he heard water approaching on the deck behind him. As he turned toward the sound and saw it coming, he got back on the ladder so as to not get wet. However, he then realized that there was even more water coming on deck than he originally anticipated, so he continued farther up the ladder. About two-thirds the way up, he realized that the wave was far bigger than he had anticipated, and he would not be able to make it safely to the poop deck above. Therefore, he stopped and braced himself against the ladder. The force of the wave was strong enough to cause him to lose his grip on the ladder, and the water tossed him onto the deck below. (The injuries for which Mr. Wendelboe now seeks damages were allegedly sustained when he was struck and pushed against the ladder by the wave.) He grabbed hold of a nearby handrail and looked around as the water subsided. He could not find the chief mate and then realized that he had been washed off the vessel by the wave. He immediately threw the nearest life ring overboard and alerted the rest of the ship’s crew of the emergency at hand. Despite immediate action by the ship’s crew and lengthy search and rescue efforts by the Coast Guard, the chief mate was never found and was presumed to have drowned at sea.
 

 Mr. Wendelboe testified that in conversations with the captain immediately following the incident, the captain expressed complete disbelief that the chief mate had gone on deck. He told Mr. Wendelboe that he had given the chief mate strict orders to bring his radio when he went to investigate the noise so that he could call the captain and inform him when he found the noise. The captain explained that he had told the chief mate that if he was going to have to go on deck to fix whatever
 
 *889
 
 | inwas making the noise, that he needed to let the captain know first, so that the captain could turn the ship and make a lee (a maneuver that turns the ship to reduce, as much as possible, the effects of the weather). According to the captain, only then would he have been prepared to give anyone permission to go onto the deck. Thus, according to the captain, the chief mate was in direct violation of his orders when he went farther than the ladder to investigate the noise. (Thus, the record reflects that the tragic death of the chief mate may have been a direct result of his own negligence.)
 

 However, as to any directives given to or overheard by Mr. Wendelboe, the evidence is not so clear. The captain testified that
 
 he believed
 
 Mr. Wendelboe was present and heard him say at the safety meeting that he was going to have the chief mate and the safety engineer (Mr. Wendel-boe) investigate the source of the noise. He admitted, however, that he could not say for sure, and also that he could not remember at all if Mr. Wendelboe was present when he gave the chief mate the specific orders and instructions regarding the extent of the investigation that he had authorized the chief mate to undertake. Mr. Wendelboe, on the other hand, testified that he did not hear anything during the meeting concerning the captain assigning him and the chief mate to investigate the noise. According to him, the first he heard of the noise was when he walked down the passageway out of the lounge with the captain and chief mate, and they were discussing what it might have been. He testified that he did not hear any orders or directives, but only noticed that the chief mate was preparing to get his gear. He asked the chief mate what he was doing, and asserted that he decided voluntarily to accompany the chief mate, so that the chief mate would not be alone and so he himself could be aware of whatever repairs he might be responsible for making as a result of the noise.
 

 The evidence reveals that the captain took reasonable precautions in authorizing the chief mate to conduct a very limited investigation so that he could |nthen take further precautionary measures to ensure that the investigation and any repairs necessary would be undertaken in the safest conditions possible. The captain ordered the chief mate to let him know before he went on deck so he could make a lee. Therefore the trial court’s finding of no negligence on the part of the captain is fully supported by the record and is not manifestly erroneous.
 

 Nor do we conclude that any negligence on the part of the chief mate would benefit the plaintiff. Although any negligence of the chief mate could be legally imputed to the defendants as the employer and ship owner, the evidence reveals that any such negligence on the part of the chief mate, while perhaps having caused his own demise, was not the proximate cause of the plaintiffs involvement in the incident or his resulting injuries. Mr. Wendelboe testified that he was not ordered to assist the chief mate nor was he aware of the orders given to the chief mate by the captain. His involvement in the activity was purely voluntary based on the explanations that he provided in his own testimony. The violation of the captain’s orders by the chief mate in venturing out onto the deck did not cause Mr. Wendelboe’s injuries. Nor did this human activity combine or concur with the wave to injure the plaintiff; the wave alone caused any damages claimed by Mr. Wendelboe.
 

 We further conclude the correctness of the trial court’s correlative finding of no negligence on the part of the plaintiff becomes irrelevant to the outcome of this litigation, which hinges on the defendants’ liability.
 

 
 *890
 
 ANSWER TO APPEAL
 

 Defendants have answered the appeal, seeking to overturn the trial court’s refusal to award all taxable costs to it as the prevailing party. Louisiana Code of Civil Procedure article 1920 provides for the taxing of costs after trial. While it is the general rule to tax the party cast in judgment, the article affords the trial court some degree of discretion, providing in pertinent part: “Except as otherwise |! ¿provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.” On review, a trial court’s assessment of costs can be reversed on appeal only upon an abuse of discretion.
 
 Ratcliff v. Town of Mandeville,
 
 551 So.2d 761, 763 (La.App. 1st Cir.1989), writ denied, 556 So.2d 37 (La.1990). When a prevailing party is taxed with costs of litigation, it is usually based on a finding that the party in some way incurred additional costs pointlessly or engaged in other conduct that justified an assessment of costs.
 
 Morrison v. Gonzalez,
 
 602 So.2d 1104, 1107 (La.App. 1st Cir.1992).
 

 In this case, the trial court did not specify its reasons for the cost assessment. However, in as much as the court found neither party to be negligent, we may assume that the trial court attempted an equitable assessment of costs based on that finding. We find no abuse of the trial court's discretion ordering each party to bear them own costs in the trial court.
 

 CONCLUSION
 

 Accordingly, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the plaintiff.
 

 AFFIRMED.
 

 [1]
 

 . This matter was previously before us on review of a final judgment concerning the issue of whether the defendants would be entitled to a reduction or offset, against any judgment the plaintiff might receive on the merits, for disability benefits already paid to the plaintiff.
 
 Wendelboe v. SeaRiver Maritime, Inc.,
 
 06-0013 (La.App. 1st Cir. 11/03/06), 950 So.2d 826 (where we decided the issue in the affirmative.)
 

 [2]
 

 . The chief mate was lost at sea and his body was never found.
 

 [3]
 

 . The plaintiff also argues in brief that the trial court issued conflicting reasons for judgment. We find no merit to this argument. Although the record does contain a document entitled oral reasons for judgment, rendered February 12, 2008, there is no judgment rendered on the basis of those reasons. Indeed, the record reflects that the trial court then ordered the parties to submit post-trial memo-randa and to also appear for hearing to make subsequent arguments as requested by the court. Clearly, the trial court changed its original findings as reflected in the oral reasons, which are clearly detailed in the subsequent oral reasons for judgment rendered March 20, 2008. and pursuant to which a final judgment was rendered and signed. Only a final judgment, and not the reasons for judgment, is appealable. Moreover, until a final judgment was rendered in this case, the trial court was within its authority to further contemplate and even change its findings of fact based on the evidence before it. Therefore, we find no merit in the plaintiff’s allegations in this regard.
 

 [4]
 

 . The record does reflect that the crew performed a slightly modified version of the boat drill,
 
 i.e., not
 
 lowering the boats all the way to the water, given the roughness of the seas.